STATE of Wisconsin, Plaintiff-Respondent,

v.

Joseph Charles FREY, Defendant-Appellant.

Court of Appeals

*No. 92–3264–CR. Submitted on briefs June 24, 1993.—Decided August 10, 1993.*

(Also reported in — N.W.2d —.)

730

For the defendant-appellant the cause was submitted on the briefs of *Jack E. Schairer*, assistant state public defender.

For the plaintiff-respondent the cause was submitted on the brief of *James E. Doyle*, attorney general and *Daniel J. O'Brien*, assistant attorney general.

Before Cane, P.J., LaRocque and Myse, JJ.

MYSE, J.   Joseph Frey appeals his conviction of first-degree sexual assault (sexual contact) with the threat or use of a dangerous weapon, in violation of sec. 940.225(1)(b), Stats., and an order denying his postconviction motion for a new trial. Frey contends that the trial court erroneously exercised its discretion by allowing the state to amend the charge from one involving sexual intercourse to one involving sexual contact. He further contends that the trial court erred by permitting the jury to consider whether his bare hands could constitute dangerous weapons. He argues that he was prejudiced by the amended charge because it contained different elements against which he had inadequate time and opportunity to prepare and present a defense. He also argues that Wisconsin law does not consider bare hands to be dangerous weapons. We conclude that Frey was not prejudiced by the amendment. However, because we conclude that bare hands are not "instrumentalities" within the statutory defini-

tion of "dangerous weapons," sec. 939.22(10), Stats., and because it is impossible to tell whether the jury considered the pillow or Frey's hands to be dangerous weapons, we reverse the judgment.

In January 1991, Cindi F. awakened early in the morning to find a man in her bedroom. She screamed and the man jumped on her and said, "Cindi, shut up or I am going to hurt you." The man sat on top of her and started choking her with his hands. She struggled with him and he put a pillow over her face so that she could not breathe. When Cindi stopped struggling, he tied her hands in front of her with a pair of her nylon pantyhose so tightly that her hands hurt and put a cotton gag in her mouth. The man kissed and fondled her breasts and vaginal area, inserted a finger into her vagina and licked her vaginal area. She noticed that he had a moustache and was wearing very rough gloves. At one point he punched her in the stomach so hard that she gagged and almost vomited. He also hit her leg with a large screwdriver. The man repeatedly called her a whore and a "prick teaser," and told her he had to teach her a lesson because she stepped on people at work to get what she wanted. He told her he had used the screwdriver to break into her house and that he cut off the power and telephone. Cindi could see that the man was wearing a blue zipped hooded sweatshirt, a t-shirt, jeans, brown work boots and a blue beanie hat. She also noticed that he had dark circles under his eyes and a wide nose. Before he left, he agreed to turn the power back on. While he was in the basement, Cindi went into the kitchen and turned the light on. The man was very angry and yelled that he would kill her if she did not turn off the light. She turned off the light and went back into her bedroom. As he was leaving, the man told her it was 5:10 a.m. "so you can set your clocks

to get up and go to work." After he left, Cindi got up and vomited in the bathroom. She then noticed that her purse was missing. Cindi's neck and wrists were badly bruised.

From a set of mug shots, Cindi identified Frey as the man who assaulted her. She later discovered that Frey's live-in girlfriend was an employe whom she supervised. A search of Frey's home and car produced a twelve-inch screwdriver that matched the pry marks around a basement window of Cindi's home, several pieces of white rope tied with slip knots, a blue hooded sweatshirt and several gold flecks similar to gold flecks found on Cindi's body after the assault. In February, Frey was arrested and charged with first-degree sexual assault (sexual intercourse), burglary and false imprisonment. That same day, Frey attempted to hang himself.

After Frey was deemed competent to stand trial, he waived his right to a preliminary hearing. Count one against Frey remained as first-degree sexual assault (sexual intercourse) in violation of sec. 940.225(1)(b), Stats., until early in the second day of the trial, after the defense presented its first witness. The state then moved the trial court to allow it to amend the information to charging first-degree sexual assault (sexual contact). The court noted that the amendment conformed to the evidence at trial and concluded that the defense would not be prejudiced by allowing the amendment.

The court instructed the jury that Frey's bare hands, the pillow, or both could be considered an instrumentality calculated or likely to cause death or serious bodily injury. During its deliberation, the jury asked the court for definitions of "instrumentality" and "device" as those words were used in the instructions.

All parties agreed that the court should read the definitions from *Perkins v. State*, 61 Wis. 2d 341, 350, 212 N.W.2d 141, 145 (1973): " 'Instrumentality' is defined as something by which an end is achieved: means. A 'device' is defined as a piece of equipment or a mechanism designed to serve a special purpose or perform a special function." (Citation omitted.) The jury subsequently found Frey guilty of first-degree sexual assault (sexual contact), false imprisonment and burglary.

Frey contends that allowing the information to be amended to charge first-degree sexual assault (sexual contact) instead of first-degree sexual assault (sexual intercourse) during the trial after the state had presented its evidence prejudiced him.[1] Section 971.29(2), Stats., allows amendment of the information if the defendant is not prejudiced. Whether to allow amendment of the information to conform to the proof is discretionary with the trial court. *State v. Flakes*, 140 Wis. 2d 411, 417, 410 N.W.2d 614, 616 (Ct. App. 1987). We will not reverse the trial court's decision to allow an amendment absent an erroneous exercise of discretion. *Id.* at 416, 410 N.W.2d at 616. "If the record shows that discretion was exercised and a reasonable basis exists for the trial court's ruling, we will sustain it." *Id.* at 417, 410 N.W.2d at 616.

It is undisputed that the amendment conformed to the proof. Cindi's testimony concerning the assault was within the definition of sexual contact in sec. 940.225(5)(b), Stats.: " 'Sexual contact' means any intentional touching by the . . . defendant, either

---

[1] The state contends that Frey waived this objection to the amendment because he failed to specifically object to the amendment. However, the record indicates that Frey did object to the amendment in general.

directly or through clothing by the use of any body part or object, of the complainant's . . . intimate parts if that intentional touching is either for the purpose of sexually degrading; or for the purpose of sexually humiliating the complainant or sexually arousing or gratifying the defendant . . . ." Frey argues that the late amendment deprived him of notice of a sexual contact charge with its concomitant "mental state" element.[2] He cites *State v. Neudorff*, 170 Wis. 2d 608, 489 N.W.2d 689 (Ct. App. 1992), in support of his argument.

In *Neudorff*, 170 Wis. 2d at 619, 489 N.W.2d at 694, we stated, "Notice to the defendant of the nature and cause of the accusations is a key factor in determining whether an amended charging document has prejudiced a defendant." (Citation omitted.) Neudorff was originally charged with possession of cocaine with intent to deliver. The morning of the trial, the state sought to change the charge to conspiracy to deliver cocaine. The amendment was brought about by new information from a witness who testified concerning the original charges at the preliminary examination, and covered a different time period and different cocaine. We held that because of these factors and

---

[2] Frey also apparently argues that the "use of a dangerous weapon" element is also a new element that he was not put on notice of by the information which charged sexual intercourse instead of sexual contact. However, sec. 940.225(1)(b), Stats., includes that element for both first-degree sexual assault (intercourse) and first-degree sexual assault (contact). We therefore reject Frey's argument that, because the first information charged intercourse instead of contact, he had no reason to focus on the use of his hands or the pillow when cross-examining the state's witnesses. Additionally, we note that Frey fails to show how his cross-examination regarding the use of his hands and a pillow would have been different.

because defense of the new charge probably would require different witnesses, Neudorff had inadequate notice of and opportunity to defend against the new charge and that allowing the amendment prejudiced him. *Id.* at 621, 489 N.W.2d at 693, 694–95.

In contrast, here the basis of the charge did not change. The criminal complaint detailed the conduct that formed the basis of the original information. The amended information was based on exactly the same conduct as described in the criminal complaint. Additionally, Frey's defense theory was that, while someone assaulted Cindi, it was not Frey. Frey asserts, however, that had he known that the state would be required to prove that his assault of Cindi was for the purpose of sexually degrading or sexually humiliating Cindi or for his own sexual arousal or gratification, he could have "put on a defense to show there was some other reason." He then points to testimony from the trial that he contends supports the inference he assaulted Cindi to hurt her and teach her a lesson for perceived injustices against his girlfriend. He also points to the fact that he attempted to commit suicide several weeks after the assault as indicative of "serious mental problems which would have explained why [Frey] did not have a sexual purpose in assaulting and choking Cindi . . . ." We are not persuaded.

■

First, evidence concerning Frey's alleged mental state after he was arrested several weeks after the assault is not highly probative of his mental state during the assault. Second, although there arguably was some evidence from which it could be inferred that Frey's purpose was to hurt Cindi in retaliation for what he perceived were injustices perpetrated on his live-in girlfriend, the record is devoid of any evidence that

Frey would have admitted the conduct and challenged only the element that the conduct was for the purpose of sexually degrading or sexually humiliating Cindi or for his own sexual arousal or gratification. Such an assertion lacks credibility in light of his primary defense of mistaken identity and the inherent difficulty of proving that inserting his finger into and licking Cindi's vagina was not done for his own sexual arousal or gratification. Because Frey's defense theory was not affected by the amendment and the record does not support his claim that he would have admitted the assault and challenged the motive, we conclude that Frey was not prejudiced by the amendment.

Frey also contends that the trial court erred by concluding that bare hands, when used to strangle someone, could be considered a dangerous weapon within the meaning of sec. 939.22(10), Stats. While Frey concedes that the pillow probably fell within the definition of a dangerous weapon, he argues that bare hands do not. Whether bare hands are a "device or instrumentality which, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm," within the meaning of sec. 939.22(10) involves the application and interpretation of a statute. This is a question of law that we review independently of the trial court's determination. *State v. Sinks*, 168 Wis. 2d 245, 253, 483 N.W.2d 286, 289 (Ct. App. 1992). The purpose of the rules of statutory construction is to give effect to the legislative intent. *State v. Pham*, 137 Wis. 2d 31, 34, 403 N.W.2d 35, 36 (1987). When determining legislative intent, we first examine the statute's language and will resort to extrinsic aids only if the language is ambiguous. *In re P.A.K.*, 119 Wis. 2d 871, 878–79, 350 N.W.2d 677,

681–82 (1984). If a statute is ambiguous, we look to its content, subject matter, scope, history and the object to be accomplished to ascertain its reasonable meaning. *Boltz v. Boltz*, 133 Wis. 2d 278, 284, 395 N.W.2d 605, 607 (Ct. App. 1986). A statute is ambiguous if reasonable persons could disagree as to its meaning, and whether a statute is ambiguous is a question of law. *Id.*

The statute's meaning cannot be determined by examining the statutory language alone because reasonable persons could differ concerning whether bare hands are a "device or instrumentality" within the meaning of sec. 939.22(10), Stats. While, as Frey concedes, bare hands may be used in a manner that death or great bodily harm is likely to result, that fact alone does not answer the question whether the legislature intended to include bare hands or other parts of the accused's anatomy in its definition of dangerous weapons. Because the statutory language provides no clear indication of the legislature's intent, reasonable people could differ concerning whether parts of the anatomy can be considered devices or instrumentalities. Indeed, the jurisdictions that have construed similar statutes are split. These opposing conclusions eloquently illustrate the statute's ambiguity. Because the statute is ambiguous, we look to its content, subject matter, scope, history and purpose to ascertain its reasonable meaning. *Boltz*, 133 Wis. 2d at 284, 395 N.W.2d at 607.

Frey contends that bare hands, because they are not separate instruments but parts of the body, cannot be considered to be "devices" or "instrumentalities." He cites *Dickenson v. State*, 75 Wis. 2d 47, 248 N.W.2d 447 (1977), *McKissick v. State*, 78 Wis. 2d 176, 254 N.W.2d 218 (1977), and A. B. 100, LEGISLATIVE COUNCIL NOTE, at 14 (1953) (enacted), in support of this proposition.

In *Dickenson*, 75 Wis. 2d at 50–51, 248 N.W.2d at 449, our supreme court held that the victim's belief that Dickenson showed her a gun, in absence of positive testimony that Dickenson was in fact armed with a dangerous weapon, was insufficient to support a conviction of armed robbery. Similarly, the court held in *McKissick*, 78 Wis. 2d at 179, 254 N.W.2d at 219, that a defendant pretending to be armed is insufficient to support a conviction of armed robbery because being armed in fact is a necessary element of the crime. Frey argues that if hands were properly considered dangerous weapons, the court would necessarily have reached the opposite conclusion in both cases. However, these cases construe a different statute than the one before us. Also, neither case involved the defendant using his hands in a manner likely to cause death or great bodily harm. Additionally, both of these cases were later superseded by the new armed robbery statute as amended in 1979. *See* sec. 943.32(2), Stats. Therefore, we conclude these cases are unhelpful.

The judiciary committee's note is equally unhelpful under these circumstances. The note distinguishes between things that are considered dangerous weapons per se (e.g., brass knuckles) and things that are not inherently dangerous but can be used or intended to be used in a dangerous manner (e.g., razors and baseball bats). The note does not discuss whether animate objects or parts of the accused's anatomy may be considered dangerous weapons.

Nor does the legislative history shed any light on the legislature's intended meaning of "device or instrumentality" as it relates to this case. Although the statute has been amended and renumbered several times since its enactment, its substance has not changed, other than to add types and descriptions of

specific weapons. Because the statute's language and history fail to reveal whether the legislature intended to include parts of an accused's anatomy within its definition of dangerous weapon, and there are no Wisconsin cases directly on point, we look to other jurisdictions for persuasive authority.

Other jurisdictions appear equally divided concerning whether parts of the human anatomy may be considered instrumentalities or devices within the meaning of a statute defining dangerous or deadly weapons with those terms. Several jurisdictions have concluded that hands, feet or teeth may be considered as instrumentalities within their statutory definitions of dangerous or deadly weapons. *See, e.g., State v. Grumbles*, 411 S.E.2d 407, 409 (N.C. Ct. App. 1991); *State v. Davis*, 422 S.E.2d 133, 144 (S.C. 1992); *State v. Born*, 159 N.W.2d 283, 284–85 (Minn. 1968); *People v. Ross*, 831 P.2d 1310, 1312 (Colo. 1992); *State v. Zangrilli*, 440 A.2d 710, 711–12 (R.I. 1982); *Ellis v. State*, 224 S.E.2d 799, 801 (Ga. Ct. App. 1976); *Cooper v. State*, 773 S.W.2d 749, 750 (Tex. Ct. App. 1989); *State v. Heinz*, 275 N.W. 10, 21 (Iowa 1937). An equal number of jurisdictions, however, have concluded that parts of an accused's anatomy are not instrumentalities within their statutory definitions of dangerous or deadly weapons. *See, e.g., Roney v. Commonwealth*, 695 S.W.2d 863, 864 (Ky. 1985); *People v. Bias*, 475 N.E.2d 253, 254 (Ill. App. Ct. 1985); *People v. Vollmer*, 87 N.E.2d 291, 293 (N.Y. 1949); *People v. Van Diver*, 263 N.W.2d 370, 372–73 (Mich. Ct. App. 1977); *Seiter v. State*, 719 S.W.2d 141, 143–44 (Mo. Ct. App. 1986); *State v. Calvin*, 24 So.2d 467, 469 (La. 1945); *Dixon v. State*, 603 So.2d 570, 571–72 (Fla. Dist. Ct. App. 1992); *State v. Gordon*, 778 P.2d 1204, 1206–07 (Ariz. 1989).

We conclude, however, that the reasoning of the latter group of jurisdictions is more persuasive and is consistent with Wisconsin's criminal statutory scheme and public policy. The Arizona Supreme Court's explanation of why it held that parts of a defendant's anatomy may not be considered as "dangerous instruments"[3] is especially persuasive. The court first observed that in those cases where parts of the anatomy were regarded as dangerous or deadly weapons, the victims suffered serious bodily harm and the state's statutory scheme did not provide penalty enhancement based on the degree of harm the victims suffered. *Gordon*, 778 P.2d at 1206. The only mechanism for penalty enhancement in such cases is to permit the jury to consider parts of the anatomy as dangerous or deadly weapons based on the harm inflicted. The court then observed:

> [A]llowing the jury to find fists a dangerous instrument without serious physical injury creates an undefined standard . . . . Some juries would find a body part was a dangerous instrument, even though no serious physical injury resulted, and others would not. Given that the statute already enhances punishment when the defendant causes serious physical injury, the jury would have little to guide it when determining whether a fist is a dangerous instrument.
>
> . . . .
>
> Finally, if fists can be dangerous instruments, then we must eventually hold that any body part

---

[3] Arizona's statutory definition of dangerous instrument is "anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury." Ariz. Rev. Stat. § 13–105.8 (1992).

can also be a dangerous instrument, depending on the circumstances. Allowing the jury to consider body parts as dangerous instruments confuses the essential elements of several crimes. For example, one cannot commit an assault without using, or threatening to use, an object or body part. . . . [S]ee also People v. Van Diver, 80 Mich. App. 352, 263 N.W.2d 370 (Mich. Ct. App. 1977) (if bare hands are a weapon every assault would be an aggravated assault and the legislature could not have intended to merge the two offenses).

Id. at 1207.

Like the Arizona statutory scheme, the Wisconsin statutory scheme differentiates between simple and aggravated battery offenses based on the amount of bodily harm intended and actually caused to the victim, see sec. 940.19, Stats., and also provides for penalty enhancers for crimes committed while possessing, using or threatening to use a dangerous weapon. Section 939.63, Stats. This scheme evinces the legislature's intent to create several different, though related, offenses that are more severely punished when greater harm comes to the victim. As noted by the Arizona and Michigan courts, all batteries involve the use of an object or a part of the defendant's anatomy. To allow juries to consider a defendant's body parts as dangerous weapons would result in penalty enhancement under sec. 939.63 for virtually every battery offense, thus blurring the legislatively-drawn line between simple and aggravated battery. Such a result would be directly contrary to the legislative intent evinced by this statutory scheme.

We recognize that sexual assault crimes, unlike battery crimes, are differentiated depending upon the presence of a dangerous weapon, the use or threat of

force or violence and actual bodily harm to the victim, among other factors not relevant to this discussion.[4] However, the same concerns are present in that most sexual assaults involve the use of a body part or object to coerce cooperation from or otherwise subdue the victim. As the Arizona court noted, juries would have very little guidance in cases such as this where the body parts as used are capable of causing death or great bodily harm, but in fact caused no great bodily harm. To allow juries to consider a defendant's body parts as dangerous weapons would blur the legislatively-created distinction between first- and second-degree sexual assault and could conceivably result in penalty enhancement under sec. 939.63, Stats., for virtually every sexual assault offense. Again, such a result would be directly contrary to the legislative intent evinced by this statutory scheme.

The aggravated use of parts of the anatomy is adequately addressed in the statutory scheme through considerations of the amount of injury or bodily harm inflicted on the victim by the defendant's use of his or her hands, feet, teeth, etc. We therefore conclude that the legislature did not contemplate the consideration of parts of a defendant's anatomy as dangerous weapons when it formulated the statutory scheme for distin-

---

[4] By way of comparison, first-degree sexual assault is non-consensual sexual contact or sexual intercourse that (1) causes great bodily harm or (2) is committed by use or threat of use of a dangerous weapon or an object used or fashioned in a manner that the victim reasonably believes it is a dangerous weapon. Second-degree sexual assault is nonconsensual sexual contact or sexual intercourse that (1) causes injury, illness, disease or impairment of a sexual or reproductive organ or mental anguish requiring psychiatric care or (2) that is committed by use or threat of force or violence.

guishing between the various degrees of crimes against bodily security.

We are concerned, as was the Arizona court, that without guidance concerning when parts of the anatomy may be considered dangerous weapons there will be inconsistent determinations. Some juries would consider hands, feet or teeth to be dangerous weapons even though no serious injury resulted, and some would not. Such inconsistencies could undermine the credibility and effectiveness of the criminal justice system.

Additionally, there is no logical stopping point in a dangerous weapon analysis when one is allowed to consider parts of the anatomy as possible dangerous weapons. For example, persons skilled in the martial arts or boxing have been trained to use various parts of their bodies to inflict grievous injury or even to kill. Because the determination that something is a dangerous weapon does not require actual injury to the victim by its use, such persons could be considered as always possessing dangerous weapons. Thus, such persons could be convicted of aggravated offenses even if they do not injure their victims or cause great bodily harm. We recognize that this is a logical extreme, but it illustrates the fact that there is no logical stopping point in a dangerous weapon analysis when one is allowed to consider parts of the anatomy as possible dangerous weapons, especially in the absence of injury to the victim. We therefore conclude that the better rule of law is to restrict the definition of dangerous weapon to animate or inanimate objects that are not part of the defendant's anatomy and allow for aggravation of offenses where defendants inflicted injuries with their hands, feet or teeth based upon the degree of harm the victims suffered.

Third, when a criminal statute is ambiguous, we follow the "rule of lenity" as stated by our supreme court in *State v. Rabe*, 96 Wis. 2d 48, 69, 291 N.W.2d 809, 819 (1980): "[P]enal statutes are generally construed strictly to safeguard a defendant's rights . . . [unless doing so] would contravene legislative purpose." (Citations omitted.) As we previously concluded, interpreting the statutory definition of dangerous weapon as excluding portions of a defendant's anatomy appears consistent with the statutory scheme. Had the legislature intended to include parts of a defendant's anatomy within this definition, it could have done so. Absent a more clear indication of legislative intent to include parts of a defendant's anatomy within the definition of dangerous weapon, we resolve this ambiguity in favor of the defendant. *See id.* at 70, 291 N.W.2d at 819.

Based upon a consideration of the entire statutory scheme reflected by the Wisconsin criminal statutes, our concern that the definition of parts of the anatomy as dangerous weapons will unnecessarily blur the distinctions between aggravated crimes and their less-aggravated counterparts and the rule of lenity, we conclude that sec. 939.22(10), Stats., does not encompass portions of the defendant's anatomy as dangerous weapons. We do not address those fact situations where a portion of the individual's anatomy is augmented by other instrumentalities, devices or articles (e.g., heavy boots when used to stomp a victim may be an instrumentality or device) because this issue is not before us.

The jury found Frey guilty of first-degree sexual assault as charged. The jury was instructed that it could consider either the pillow, Frey's hands or both to

be a dangerous weapon, a required element of the offense. Because the general guilty verdict is supportable on one ground,[5] but not on the other, and we cannot tell which ground the jury selected when it convicted Frey of first-degree sexual assault with a deadly weapon, we must set the verdict aside and remand the matter for a new trial. *See Griffin v. United States*, 112 S.Ct. 466, 470–71 (1991).

*By the Court.*—Judgment reversed and cause remanded.

---

[5] Frey concedes that the pillow, used to cover Cindi's face so that she could not breathe, could be considered a dangerous weapon.