93 N.Y.2d 398 (1999)
712 N.E.2d 1228
690 N.Y.S.2d 863
THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v.
MAXWELL OWUSU, Appellant.
Court of Appeals of the State of New York.
Argued February 17, 1999.
Decided May 13, 1999.
*399 Edward D. Friedman, Brooklyn, for appellant.
Charles J. Hynes, District Attorney of Kings County, Brooklyn (Joyce Slevin and Roseann B. MacKechnie of counsel), for respondent.
Chief Judge KAYE and Judges SMITH, LEVINE and CIPARICK concur with Judge WESLEY; Judge BELLACOSA dissents and votes to affirm in a separate opinion; Judge ROSENBLATT taking no part.

OPINION OF THE COURT
WESLEY, J.
In this case we are called upon to decide whether an individual's teeth can constitute a "dangerous instrument" within the meaning of Penal Law § 10.00 (13). While the use of an object to produce injury is an appropriate analytical vehicle to determine whether an object is dangerous, the statute's ordinary meaning, its legislative history and our jurisprudence persuade us that an individual's body part does not constitute an instrument under the statute. We therefore reverse the order of the Appellate Division.
Defendant Maxwell Owusu is charged in a 13-count indictment with burglary in the first degree (Penal Law § 140.30 [3] [use or threatened use of a dangerous instrument during the burglary of a dwelling]); four counts of burglary in the second degree (Penal Law § 140.25 [1] [b] [causing physical injury during burglary]; § 140.25 [1] [c] [use or threatened use of a dangerous instrument during burglary]; § 140.25 [2] [burglary of a dwelling]); assault in the first degree (Penal Law § 120.10 *400 [1] [causing serious physical injury with a dangerous instrument]); two counts of assault in the second degree (Penal Law § 120.05 [1] [intentionally causing serious physical injury]; § 120.05 [2] [intentionally causing physical injury with a dangerous instrument]); and two counts of assault in the third degree (Penal Law § 120.00 [1] [intentionally causing physical injury]; § 120.00 [3] [injury with a dangerous instrument through criminal negligence]). Four counts of the indictment contain the aggravating factor that defendant used or threatened to use a dangerous instrument.
These charges stem from an incident in which defendant forced his way into his estranged wife's apartment and became embroiled in a fight with another man. During the fight, defendant bit the victim's finger so severely that nerves were severed.
Supreme Court dismissed three of the counts (burglary first [dangerous weapon used or threatened in a dwelling], assault first [intentional serious physical injury caused by a dangerous instrument] and assault second [physical injury caused by a dangerous instrument]), and reduced one count of burglary second (threat or use of a dangerous instrument) to burglary third. The court reasoned that defendant's teeth could not constitute a dangerous instrument. The Appellate Division, with one Justice dissenting, reversed. Citing People v Carter (53 NY2d 113), the Appellate Division applied a "use-oriented approach" and determined that teeth can be a dangerous instrument (248 AD2d 491, 492). A Judge of this Court granted defendant leave to appeal.
In People v Carter (53 NY2d 113, supra), we stated that "`any instrument, article or substance,' no matter how innocuous it may appear to be when used for its legitimate purpose, becomes a dangerous instrument when it is used in a manner which renders it readily capable of causing serious physical injury" (id., at 116 [internal citations omitted] [emphasis in original]). The People point to Carter and the recodification of the Penal Law in 1967 as clear indications that the meaning of "dangerous instrument" should be subject to case-by-case functional inquiries into the use of instruments, articles or substances (see, Penal Law § 10.00 [13]).[1]
It is readily apparent, and the People do not argue to the contrary, that a part of one's body is not encompassed by the *401 terms "article" or "substance" as used in the statute. But what of the term "instrument?" The starting point of statutory interpretation is, of course, plain meaning (Council of City of N. Y. v Giuliani, 93 NY2d 60, 68-69). In our view, the plain meaning of instrument in this context is a device or object which is capable of causing harm as defined by the statute. One's hands, teeth and other body parts are not, in common parlance, "instruments."
The Penal Law and our jurisprudence have long recognized that how an object is used determines if it is "dangerous." Neither the Legislature nor the courts, however, have classified a person's hands, teeth or other body part as a weapon or instrument. Contrary to the People's position, the definition of a dangerous weapon under former law parallels the current definition of a dangerous instrument. The prior statute included any "other instrument or thing likely to produce grievous bodily harm" (former Penal Law § 242 [4]; see also, former Penal Law § 1897). The 1937 Law Revision Commission Report noted that killing "with bare fists cannot be said to be effecting death with a `dangerous weapon,' and * * * a fatal shooting * * * may be termed killing with a `dangerous weapon' as a matter of law" (1937 Report of NY Law Rev Commn, at 728). The Commission noted that "[b]eyond this statement there is no absolute certainty," but the extreme positions, at least, were considered well defined (id.).
In working on the recodification of the Penal Law, the State Commission Revision of the Penal Law and Criminal Code noted that the proposed "dangerous instrument" provision was meant to "includ[e] assaults committed with knives, crowbars, etc., as well as those committed with firearms, blackjacks, metal knuckles, etc. [i.e., the enumerated devices]" (Commission Staff Comments on Changes in the New Penal Law since the 1964 Study Bill, McKinney's Revised Penal Law Special Pamphlet, at 272, reprinted in 1969 Gilbert Criminal Law and Practice, at 1D-15). There is no indication that the purpose was to expand the definition of dangerous instrument, as it was then understood, to include the human body itself, and indeed the specific reference to obviously dangerous objects such as "knives" and "crowbars" suggests that such an expansive reading was not at all intended. Thus, our analysis is not premised on placing an exclusion in the statute's definition; *402 rather, it is founded on the well-documented legislative history that a body part was never considered a dangerous weapon or instrument.
A recent amendment to the second degree assault statute signals that the Legislature has not embraced the all encompassing interpretation of the statute offered by the People. The amended section imposes criminal liability on an adult for intentionally causing physical injury to a child under seven (Penal Law § 120.05 [9]).[2] If a body part such as a hand were within the sweep of the Penal Law definition of a dangerous instrument, however, there would have been no need for the legislation. A jury would be free to conclude that, under the "use-oriented" approach, an adult's hands could constitute a dangerous instrument when used against a child for assault in the second degree (intentionally causing physical injury with a dangerous instrument [Penal Law § 120.05 (2)]). Because the Legislature did not consider hands or other body parts to constitute dangerous instruments, the new provision was necessary.[3]
The proper statutory interpretation can only be reached upon careful objective historical and structural analysis. In light of this long history, reflected in both the 1937 and 1964 Staff Comments of the Law Revision Commission and the State Commission on Revision of the Penal Law and Criminal Code, the best evidence suggests that the Legislature always intended that the "dangerous instrument" concept be limited to external objects.
Our jurisprudence also reflects that, although the Penal Law invoked criminal liability for innocuous objects capable of causing physical harm, a person's body was never considered to fall within the statute's scope. In People v Adamkiewicz (298 NY 176), this Court assessed whether a particular item was dangerous in terms of its use in a given circumstance. There, the Court was construing Penal Law § 1897 (carrying and use *403 of dangerous weapon). The statute set forth two categories of "dangerous weapon[s]": one, an itemized list of objects, and the second enumerating various types of items as well as "any other dangerous or deadly instrument, or weapon." The Court held that the second category was broad enough to include an ice pick "because of its obviously inherent dangerous and lethal character" (id., at 178).
The following year, in People v Vollmer (299 NY 347), this Court held that the defendant could not be found to have used a dangerous instrument under the first degree manslaughter statute when he beat a man to death with his bare hands, because "[w]hen the Legislature talks of a `dangerous weapon', it means something quite different from the bare fist of an ordinary man" (id., at 350, citing 1937 Report of NY Law Rev Commn, at 731; also citing, People v Adamkiewicz, supra, and other cases). The People would have us ignore Vollmer (and the historical development of the dangerous instrument concept) on the basis that the 1967 revision of the Penal Law greatly expanded the dangerous instrument concept. As indicated, however, that is simply not the case.
Nor can the argument be made that by the "ordinary man" language in Vollmer the Court meant to leave the door open to the possibility that the hands of a boxer or martial arts expert could constitute dangerous instruments (see, dissenting opn, at 411). This would create an interesting anomaly itself, insofar as the defendant in Vollmer beat the victim to death with his "ordinary" hands. An "extraordinary man" rule would create increased criminal liability for use of a dangerous instrument where a heavyweight champion merely threatens a blow (see, Penal Law § 10.00 [13] [definition of dangerous instrument includes use or "threatened" use]), but not where an ordinary man beats another to death. Vollmer sensibly avoided such a strained interpretation by concluding fists are not dangerous instruments. This conclusion was reached not because the defendant's fists, as utilized under those circumstances, were not readily capable of causing death (they in fact did), but because they were simply his hands, nothing more.
In every case where this Court has been called upon to decide whether something constitutes a dangerous instrument, the focus has been on an object. In People v Galvin (65 NY2d 761), for example, the defendant grasped the victim's head and smashed it into a sidewalk, causing severe injuries. The Court held that the sidewalk constituted the dangerous instrument (see also, People v Curtis, 89 NY2d 1003 [belt wrapped around *404 defendant's fist]; People v Vasquez, 88 NY2d 561 [wadded-up paper towel stuffed in victim's mouth]; People v Cwikla, 46 NY2d 434 [handkerchief used to gag an elderly victim, choking her to death]). Thus, our "use-oriented approach" has always been directed at understanding if an instrument is (or can be) "dangerous"; it has not been used as a guide to determine if the means by which the victim was injured was an "instrument".
To be sure, defendant is charged with causing serious physical injury to his victim under one second degree assault count of the indictment (Penal Law § 120.05 [1]), one of many charges obviously unaffected by our decision here. However, another count of the indictment charging assault in the second degree (Penal Law § 120.05 [2]) is not correlated to the severity of the victim's injury, but to its causethe use of a dangerous instrument. To allow criminal liability to be enhanced solely on the potential for serious physical injury in an assault that does not involve an object even when only physical injury need be shown (Penal Law § 120.05 [2]) blurs the statutory gradations of liability for assaults and effectively repeals subdivision (1) of Penal Law § 120.00 (assault in the third degreeintentionally causing physical injury).
If a person is capable of producing a serious physical injury and does so, his criminal liability should be measured by the result (the injury), not the potential to do so. To hold otherwise would introduce a potentially confusing array of "relevant" evidence in proving liability under Penal Law § 120.05 (2) since a dangerous instrument is defined by its ability to produce a serious physical injury or death in the circumstances in which it is used or threatened, or attempted to be used (Penal Law § 10.00 [13]). Thus, the size of the perpetrator, his weight, strength, etc., as well as any infirmities or frailties of the victim would all be relevant in understanding one's ability to cause serious physical injury or death. A sliding scale of criminal liability (the extraordinary man anomaly) would be the result. While some of the same potential exists in cases involving foreign objects, that decision was made long ago by the Legislature. Our jurisprudence has drawn the line at a reasonable interpretation of the term "instrument" and has not included within it a person's hands or other body parts.
The People's position also creates mischief with the burglary statute where, as in this indictment, the aggravating factor is the use or threatened use of a dangerous instrument without the necessity of any injury (compare, Penal Law § 140.25 [1] *405 [c]; § 140.30 [3]; see, State v Frey, 178 Wis 2d 729, 742, 505 NW2d 786, 791 [holding that defendant's bare hands did not constitute a "dangerous weapon * * * or instrumentality," in part because "[a]llowing the jury to consider body parts as dangerous instruments confuses the essential elements of several crimes"]). Under the People's understanding of both the statute and our prior jurisprudence, any person of substantial size or physical strength faces significantly enhanced criminal liability with the mere threat of a blow, or a bite. Would the People seriously endorse the prospect of indicting Mr. Owusu for baring his teeth during a burglary?[4]
Increased criminal liability arises from the use or threatened use of a dangerous instrument because the actor has upped the ante by employing a device to assist in the criminal endeavor (see, Commonwealth v Davis, 10 Mass App 190, 196-197, 406 NE2d 417, 421-422 [holding that teeth cannot constitute "dangerous weapon"]). Mr. Owusu's teeth came with him. In our view, that alone should not expose him to criminal liability beyond that measured by the extent of his victim's injury, and Supreme Court properly dismissed or reduced those counts of the indictment predicated upon defendant's use of a dangerous instrument (see generally, Annotation, Parts of Human Body as Dangerous Weapons, 8 ALR4th 1268, 1269 [noting that "the main line of authority * * * is to the effect that in no circumstances can fists or teeth be found to constitute deadly or dangerous weapons"]; Commonwealth v Davis, supra, 10 Mass App, at 194, 406 NE2d, at 420 [noting that "(t)he clear weight of authority is to the effect that bodily parts alone cannot constitute a dangerous weapon"]).
The dissent premises its disagreement on a foundation of five concerns; none are up to the test. The dissent's troublement regarding our alleged statutory misconstruction is founded upon a fundamental misconception. We do not reject the principle that the words of statutes are the primary indicia of their meaning; we simply do not accept the dissenter's view of the plain meaning of the term "instrument." The "plain" words of the statute have consistently been understood by this Court (and the courts of many other States) and the Legislature to mean that an instrument is not one's arm, hand, teeth, elbow or any other body part.
*406 Our decision does not plow new groundthe interpretation and application of the statute is firmly rooted both in the efforts of the Legislature and in our jurisprudence. Indeed, the dissenter concedes that in 1949 this Court unanimously ruled that a man's handseven though they killed anotherwere not dangerous instruments. Did the Vollmer Court overlook this purported long-standing, "all encompassing meaning?" We think not. The Court then (and now) did not engage in judicial legislation, it simply tried to make sense of a statutory term whose meaning was the focus of the case. The Court looked to its precedents and the legislative history of the statute, as we have done. To now change the statute's sweep will unsettle the careful statutory scheme of increased criminal liability arising from the use, or threatened use, of a dangerous instrument, and will result in applications that are without common sense.
Accordingly, the order of the Appellate Division should be reversed and the order of Supreme Court reinstated.
BELLACOSA, J. (dissenting).
Respectfully, I vote to affirm the order of the Appellate Division. It upheld all the disputed counts charged against the defendant (248 AD2d 491 [Rosenblatt, J. P., Ritter and Goldstein, JJ.; O'Brien, J., dissenting]). So would I.

I.
Defendant was charged with forcing his way into his estranged wife's apartment. There, in the presence of her three children, he started a fight with Michael Samuel, punching him in the face and the chest and wrestling him to the floor. Defendant's wife and another woman managed to drag defendant off Samuel, but not before defendant bit Samuel's left index finger to the bone, severing nerves in the finger and causing serious permanent injuries.
Defendant was indicted on 13 counts stemming from the incident. Four of these countsburglary in the first degree (Penal Law § 140.30 [3]); burglary in the second degree (Penal Law § 140.25 [1] [c]); assault in the second degree (Penal Law § 120.05 [2]); assault in the third degree (Penal Law § 120.00 [3])require as an element of the crime that the perpetrator have employed a "dangerous instrument".
The only question in this purely statutory interpretation appeal, affecting four serious counts of the indictment against defendant, is whether defendant's teeth constituted a "dangerous instrument," as that term is defined in the pertinent statutes of the Penal Law.
*407 The Majority rules not only that defendant's teeth did not constitute an "instrument" in this case, but also that, as a matter of law, under no circumstances may any part of any person's natural body ever qualify as a "dangerous instrument"the full statutory phrase. By this holding, the Majority substantially subtracts from the statute, while materially augmenting the breadth of People v Vollmer (299 NY 347), and disregarding the import of People v Carter (53 NY2d 113, 115). In breaking this new ground, the Majority dysfunctionally discounts the role and powers of prosecutors who screen out the quality and gravity of particular charges they present to a Grand Jury, and disregards a petit jury's ability to differentiate when someone's teeth are just the human instrument for chewing, and when an accused uses them as a dangerous criminal instrument. The reversal analysis is, thus, substantially outweighed by an array of countervailing authorities supporting the affirmance that I urge.
In sum, the Majority's per se holding contradicts:
 the plain, unqualified words of the statute;
 the more cogent legislative history, if that source must be used;
 well-settled statutory interpretation precedents that circumscribe judicial activity reserved to the legislative realm;
 practical context and realistic application of the prosecutorial tool;
 and last, but not least, common sense.
Yet, the Majority summarily dismisses these complementary affirmance points, while this lone dissenter maintains that each ground is quite cogent in supporting a more measured resolution of this case and its key issue.

II.
I begin my assessment with the legislatively decreed plain language definition of a "dangerous instrument": "`Dangerous instrument' means any instrument, article or substance, including a `vehicle' as that term is defined in this section, which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury" (Penal Law § 10.00 [13]). The Majority finds it necessary to search beneath the *408 embracive and unconditional statutory language. Its eschewal of the orderly, threshold plain language rubric, in judicial statutory interpretive analysis, is seriously unsettling in and of itself.
Anything that can be used to cause death or serious injury fits within the meaning of the sweeping statutory words, the only controlling definition. Undeniably, too, the statutory formula contains no exclusion for parts of the human body or for anything else for that matter. Thus, carving a substantive and categorical exclusion out of the statute is beyond this Court's allocated role in the distribution of lawmaking authority; it seems to me that what is being done here is nothing less than the functional equivalent of judicial legislation[1] (see, People v Finnegan, 85 NY2d 53, 58, cert denied 516 US 919 [noting the well-settled principles that "courts are not to legislate under the guise of interpretation" and "the failure of the Legislature to include a substantive, significant prescription in a statute is a strong indication that its exclusion was intended"]; Matter of Alonzo M. v New York City Dept. of Probation, 72 NY2d 662, 665-666 ["Where a statute describes the particular situations in which it is to apply and no qualifying exception is added, `"an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded"'"]; see also, Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98, 103, n 1 [Majority there rejecting that Dissent's thesis in support of a New York City agency's attempt to engraft the agency version of a definitional exclusion onto unqualified statutory language]).

III.
In addition to the plain language direction as to how to discern the meaning of this statute, the legislative history of Penal Law § 10.00 (13), when courts must turn to that analytical step, offers useful instruction. The history does not support *409 the Majority's departure from the case-by-case application of the pertinent statutes as to whether particular human body parts used by particular defendants may be prosecuted at all. The Majority mistakenly stresses that the Penal Law Revision Commission, in working on the recodification of the Penal Law in the 1960's, noted that the proposed "dangerous instrument" provision was meant to "includ[e] assaults committed with knives, crowbars, etc., as well as those committed with firearms, blackjacks, metal knuckles, etc." (majority opn, at 401).
Using that list, the Majority writes in an unrestricted, new and constrictive boundary of its own making, and reaches a conclusion that "the specific reference to obviously dangerous objects such as `knives' and `crowbars' suggests" that an expansive reading of the definition to include parts of the human body was not intended (majority opn, at 401). This turns the analytical process inside out. The judicial interpretive inquiry that should be dispositive here is whether the Legislature used plain language to reflect its intent on the question of excluding all body parts from the words "any instrument." The Legislature did not do so, or even so indicate. That should bind the courts to the standard interpretive method and canons of construction.
In any event, the secondary source materials relied on by the Majority plainly reflect an illustrative list, not an exhaustive or exclusive one. Indeed, that limited list of "obviously dangerous" objects, up to now, has supported this Court's meticulous, common-law approach to determining such issues on a case-by-case, fact-intensive basis. Thus, other innately innocent or innocuous items such as paper towels, a sidewalk, rubber boots and even a handkerchief have consistently over many years been found to meet the definition of a "dangerous instrument", when used in a manner which rendered them capable of causing serious physical injury (see, People v Adkinson, sub nom. People v Vasquez, 88 NY2d 561; People v Galvin, 65 NY2d 761; People v Carter, 53 NY2d 113, supra [cited both by the Majority and Dissent at the Appellate Division in the instant case (248 AD2d 491, supra) and a most cogent recent declaration of this Court supporting the view I advance]; People v Cwikla, 46 NY2d 434). The Majority's restrictive interpretation breaks away from this discipline and cannot be reasonably squared with this Court's flexible and progressive precedents on this very subject.
*410 Even more significantly, the available legislative history cuts further against the Majority's reformation of the statute that naturally reflects the only words of the Legislature's enactment. The Fourth Interim Report of the State Commission on Revision of the Penal Law and Criminal Code discusses the differences in the "old" and "new" definitions of "dangerous instrument" (1965 NY Legis Doc No. 25, at 12). The Commission noted that the "old definition" of "dangerous instrument" was "in terms of an instrument or substance `readily capable of being used to produce death or serious physical injury'" (id.). The Commission characterized that definition as "encompass[ing] virtually every tangible item on earth" (id. [emphasis added]). The "new definition is in terms of an instrument having such a potential `under the circumstances in which it is used, attempted to be used or threatened to be used'" (id.).
Instructively, the legislative recodification of the mid-60s did not retreat from the unrestricted meaning and usage of "an instrument." Rather, it pinpointed that the dangerousness of the instrument must be assessed based on its actual use, not on its innate or even usual capacity for use. That policy goal is better served and fulfilled by realistically-applied jurisprudence, not logical abstractions.
Thus, the legislative history complements the prevailing plain-words approach, and further indicates that the scope of the definition of "dangerous instrument" is limited only by the use to which those statutory words"any instrument"are put. It should not be cut off by a post-enactment afterthought and does not hinge on the ordinarily innocent, inherent characteristics of an instrument at issue in a given case. Since the human body and its parts are indisputably "tangible," and "on earth," the legislative history of section 10.00 (13) refutes the categorical severance from the statute that today's holding effectuates.

IV.
I turn next to People v Vollmer (299 NY 347, supra). The Majority relies on an excerpted sentence from the case: "When the Legislature talks of a `dangerous weapon', it means something quite different from the bare fist of an ordinary man" (id., at 350 [emphasis added]). Yet, the holding of that case itself falls far short of the sweep of this case flying on the wing of that one. Instead of espousing an escalation to an absolute bar against parts of the human body ever being considered as dangerous instruments, Vollmer precisely confines the reach of *411 its holding to "an ordinary" person's use. If the Vollmer Court had intended to exclude the fists of any person, it would not have included the telling adjective. Tacking on the "ordinary" qualifier plainly denotes that the Court considered it possible that the fist of an extraordinary personsuch as a boxer, a martial arts expert or even a comparatively large or strong personcould constitute a "dangerous instrument," under the statute and in case-by-case interstitial developmental circumstances. Thus, neither the Legislature's words ("any instrument") nor this Court's words ("ordinary" person) support the crimp now squeezed onto the operation of the pertinent statute by this transmutive holding.
Additionally, Vollmer is particularly limited to bare fists. While it may take special skill or disproportionate size or strength to render a fist a dangerous instrument under the circumstances in which it is used, "ordinary" folks are capable of using natural teeth to inflict serious injury, even upon larger or stronger victims. Mike Tyson's fists, we may all agree, were not intended to be covered by Vollmer; Evander Holyfield might then legitimately wonder about the implied extrapolation from this case holding that Tyson's (or anyone else's) "choppers" could never be deemed or used as an "instrument" of dangerous propensities or properties.
Since Vollmer leaves open the possibility that the bare fists of an extraordinary person might constitute a "dangerous instrument," it sensibly followsthough rejected by the Majority as a matter of lawthat teeth, naturally (as in the instant case) or artificially enhanced or replaced, could also be used in a manner that might constitute a "dangerous instrument," as a matter of fact and proper proof. Yet, the Majority's projection of Vollmer now takes hands and teeth, and every other human part, out of the realm of realistically possible prosecutions, as a matter of law.

V.
Other courts have probed whether teeth can constitute a dangerous instrument under respective and different statutory formulations. Some refuse to draw an artificial line, viewing the categorical approach as an "exercise in empty formalism" (United States v Sturgis, 48 F3d 784, 788, cert denied 516 US 833 [4th Cir]; United States v Moore, 846 F2d 1163 [8th Cir]). The Fourth Circuit aptly reasoned:
"The test of whether a particular object was used as a dangerous weapon is not so mechanical that it can be readily *412 reduced to a question of law. Rather, it must be left to the jury to determine whether, under the circumstances of each case, the defendant used some instrumentality, object, or (in some instances) a part of his body to cause death or serious injury. This test clearly invites a functional inquiry into the use of the instrument rather than a metaphysical reflection on its nature" (United States v Sturgis, supra, at 788).
The "metaphysical" interpretive exercise flexed to reach the broad holding in the instant case may also inevitably conjure up absurd results. Can the Legislature really be deemed to have meant that if someone bites with dentures or a dental plate then that person can be found to have used a "dangerous instrument," but if powerful natural teeth are used there are no legally cognizable circumstances under which the teeth of that aggressor can be considered a "dangerous instrument" for appropriate criminal responsibility? The artificial, prosthetic or enhanced fact patterns spinning off this theme are limited only by one's imagination, and can be either farcical or monstrous. The potential variations, however, underscore the uneven consequences that this newly launched exclusiononly now for the first time judicially engrafted upon Penal Law § 10.00 (13)can generate. Why a different analysis and result should apply when the assault is accomplished by means of biting to bone with natural teeth in a given case, producing serious permanent injuries as the Appellate Division Majority below emphasized, is not satisfactorily answered for me.
In sum, the strain of the Majority's formalistic logic falls over backwards from the extreme conclusion that body parts can never be "dangerous instruments." If ever Justice Oliver Wendell Holmes' aphorism applied"[t]he life of the law has not been logic, it has been experience"this case proves his lesson (Holmes, The Common Law, at 1 [1881]).

VI.
The Majority also claims that Penal Law § 120.00 (1) will be effectively repealed and the gradations of the Penal Law will be blurred if body parts are even allowed to be considered dangerous instruments in given cases. No persuasive explanation is evident for this broad assertion, nor why it should be deemed so compelling or even necessary in this case. Surely a jury would be within its powers to determine that an open-handed slap, a kick, a shove or even a whack with a rolling pin or other inanimate object constituted third degree assault under subdivision (1), without rising to the level of an assault *413 with a dangerous instrumenteven assuming a prosecutor did not screen out the presentment of such charges in the first place as a matter of ordinary prosecutorial discretion. Yet, no jury will ever get to pass on the issue in this case, nor any in all the cases that will be hereafter governed by its per se sweep.
Moreover, subdivisions (1) and (2) of the second degree assault statute would overlap no more than they already do under this Court's extant, governing precedents (see, e.g., People v Cwikla, 46 NY2d 434, supra; People v Adkinson, sub nom. People v Vasquez, 88 NY2d 561, supra). Additionally, the Majority's reliance on the recent addition of a new subdivision (8) to Penal Law § 120.05 sidesteps the context of the amendmentit is but a small part of a comprehensive bill addressing all kinds of sexual assault crimes against children. The amendment is, thus, essentially irrelevant to the more sharply focused issue presented by this case.
These unpersuasive collateral braces aside, the reasoning that leads the Majority to its matter-of-law blanket prohibition seems also to be built upon the skeptical assumption that no jury would be capable of distinguishing between a body part used in an ordinary fashion, even if it inflicts harm, and one used in a criminal manner so as to constitute a "dangerous instrument" that produces serious bodily harm. Surely, if a jury is capable of determining whether a handkerchief as used under certain circumstances constitutes a "dangerous instrument," it should be able to make the refined distinction with respect to a body part. As the Sturgis court pointed out, a jury might reject the notion that an open-handed slap constituted use of a dangerous instrument under the circumstances, while at the same time accepting that the use of fingernails to claw out someone's eyes did constitute use of a dangerous instrument (United States v Sturgis, supra, at 788). These human experiences and variations overwhelmingly prove that these cases are fact-intensive, and should not be subjected to an abstracted matter-of-law regime.

VII.
Having tried to present my own thesis and analysis, and to address the Majority's multi-pronged rationale for overriding the plain language of Penal Law § 10.00 (13), I return to where all courts are obligated to start: the legislatively-decreed utterance of the definition of "dangerous instrument." It is "any instrument, article or substance * * * which, under the circumstances in which it is used, attempted to be used or threatened *414 to be used, is readily capable of causing death or other serious physical injury" (emphasis added). These legislative words are supple and elastic, not constrictive and rigid. If natural teeth can never be "any instrument, article or substance," the Legislature should remove them from the sensible operation of the statuteand surely knows how to do that (contrast, Karlin v IVF Am., 93 NY2d 282, 290, n; Matter of Alonzo M. v New York City Dept. of Probation, 72 NY2d 662, supra).
Judicial work is an art, not a science. The craft traces, delves and shapes wordsthe Legislature's and the Judiciary's. Unless or until the Legislature exercises its prerogative[2] of performing major surgery on a statute, "`the court should construe [the statute] so as to give effect to the plain meaning of the words used'" (Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98, 107, supra, quoting Patrolmen's Benevolent Assn. v City of New York, 41 NY2d 205, 208 [emphasis omitted]).
In sum, I have searched the statute itself in vain for words, or even import, of substantial and categorical limitation. Likewise, I have searched the Majority's reversal rationale. I come up equally empty as to why the Court today chooses to retreat from its well-settled statutory interpretation methodology and precedents to decide this kind of case in this way (see, Matter of Raritan Dev. Corp. v Silva, supra, at 104-108; People v Finnegan, 85 NY2d 53, supra; Matter of Jose R., 83 NY2d 388, 393-394; Matter of Alonzo M. v New York City Dept. of Probation, 72 NY2d 662, supra; Doctors Council v New York City Employees' Retirement Sys., 71 NY2d 669, 674-675). There is a compelling necessity to express this dissenting view, especially in this statutory construction case because a blanket bar is being created. Moreover, the Legislature is entitled to have the Majority's declaration brought to its more pointed attention for amendatory consideration, if that Branch of lawmaking government so desires. The standard mechanism for accomplishing this is the casting of my dissenting vote, through *415 this Opinion that the Majority misconstrues the Legislature's original intent and misaligns the array of authorities that support an affirmance of a correct and nimble Appellate Division Majority decision (248 AD2d 491, supra).
Order reversed, etc.
NOTES
[1] Penal Law § 10.00 (13) provides: "`Dangerous instrument' means any instrument, article or substance * * * which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or serious physical injury."
[2] In 1990, the Legislature added a new subdivision (8) to the second degree assault statute (Penal Law § 120.05 [8]; L 1990, ch 477, § 2). This new crime requires that the adult must intend to cause physical injury to the child and recklessly cause serious physical injury (id.). The section was enacted in "recogni[tion] that an adult's hand/fist may, when used against a child, be the fair equivalent of a weapon" (Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law art 120, at 136).
[3] In People v Johnson (122 AD2d 341), a case involving an assault on a child by an adult, the Appellate Division reversed a conviction for second degree assault when the jury was asked to determine if defendant's hands were a dangerous instrument under a use-oriented approach.
[4] The Penal Law is replete with crimes where the degree of culpability is enhanced by the use, threatened use or display of a dangerous instrument (see, e.g., Penal Law § 120.14 [1] [menacing in the second degree]; § 160.15 [3] [robbery in the first degree]).
[1] Cardozo, The Nature of the Judicial Process: "This does not mean that there are not gaps, yet unfilled, within which judgment moves untrammeled. Mr. Justice Holmes has summed it up in one of his flashing epigrams: `I recognize without hesitation that judges must and do legislate, but they do so only interstitially; they are confined from molar to molecular motions'" (Selected Writings [Hall ed], at 134).
[2] With a delicious wordplay particularly apt for this case, the Great Bard provides a masterful conversation among a well known rebel band on how law can be made. In the Second Part of Henry VI, Act 4, Scene 7, lines 7-19, the following ensues:

"Dick [The Butcher]. Only that the laws of England may come out of your mouth. * * *
"[Jack] Cade. I have thought upon it; it shall be so. Away! burn all the records of the realm: my mouth shall be the parliament of England.
"Holl[and]. (Aside.) Then we are like to have biting statutes, unless his [Jack Cade's] teeth be pulled out." (The Yale Shakespeare [emphasis added].)