**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
　　　　　　*Plaintiff-Appellee,*

　　　　　v.

VICTOR ROCHA, also known as
Mono, also known as Victor
Rosales,
　　　　　　*Defendant-Appellant.*

No. 08-50175

D.C. No.
5:05-cr-00069-
VAP-1

OPINION

Appeal from the United States District Court
for the Central District of California
Virginia A. Phillips, District Judge, Presiding

Argued and Submitted
November 3, 2009—Pasadena, California

Filed March 18, 2010

Before: Thomas G. Nelson, Jay S. Bybee, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Bybee

**COUNSEL**

Gene D. Vorobyov, Law Office of Gene Vorobyov, California, for the defendants-appellants.

Thomas P. O'Brien, United States Attorney, Sheri Pym, Antoine F. Raphael (argued), Sean K. Lokey, Assistant United States Attorneys, for the plaintiffs-appellees.

## OPINION

BYBEE, Circuit Judge:

After participating in a brawl in a federal correctional facility that resulted in the death of a fellow inmate, Victor Rocha was convicted on two counts: (1) assault committed by means of force likely to produce great bodily injury under California Penal Code § 245, as assimilated into federal law by the Assimilated Crimes Act, 18 U.S.C. § 13; (2) assault with a dangerous weapon under the federal assault statute, 18 U.S.C. § 113(a)(3). Rocha appeals both convictions, arguing, first, that the Assimilated Crimes Act did not properly assimilate the California statute and, second, that there was insufficient evidence supporting his conviction of assault with a dangerous weapon. We are compelled to agree, and we conclude that the federal assault statute precludes application of California Penal Code § 245 and that the evidence presented to the jury that Rocha used his bare hands to perpetrate the assault cannot support a conviction under the federal assault statute for assault with a dangerous weapon. We reverse his convictions.

I

On the evening of April 11, 2005, Victor Rocha was ironing clothes on the first floor of a prison block in the United States Penitentiary in Victorville, California. Above him, a group of inmates entered David Fischer's cell, and a fight erupted. The attacking inmates stabbed Fischer four times inside his cell before Rocha joined the fray. The fight surged into the hall where Rocha, observing the fight from below, ran to join it, presumably because his friends were involved in

Fischer's attack.[1] A security videotape reveals that Fischer was backing away from his attackers when Rocha came up from behind him, reached down, grabbed the six-foot-seven, three hundred pound Fischer by his feet, and pulled his feet out from under him, causing Fischer's body to slam down onto the concrete floor. Rocha continued to fight with Fischer, and other inmates continued kicking Fischer while he was on the ground.

An unidentifiable group of inmates then tried, unsuccessfully, to pick up Fischer and throw him over the second floor railing, a drop of about thirteen feet to the waiting concrete floor.[2] Fischer later died from this senseless violence; his autopsy revealed that four stab wounds caused his death, but that he also had an abrasion on his forehead, a contusion over his right eye, and a narrow abrasion on his right eyelid.

The government charged Rocha with assault committed by means of force likely to produce great bodily injury under California Penal Code § 245, as assimilated into federal law by the Assimilated Crimes Act, 18 U.S.C. § 13. The government also charged Rocha with assault with intent to commit murder and assault with a dangerous weapon under the federal assault statute, 18 U.S.C. § 113(a)(1) and (3). After a jury trial, the jury acquitted Rocha of the charge of assault with intent to commit murder, 18 U.S.C. § 113(a)(1), but convicted him of the other two assault counts. The district court sentenced Rocha to an eighty-seven month term of imprisonment, finding that Rocha's attack was unprovoked, brutal, and gang related. Rocha timely appealed.

---

[1]The parties stipulated at trial that Rocha was "acquainted and associated with" the inmates who beat and stabbed Fischer.

[2]The only eyewitness to the fight, Office Walters, could not identify which inmates were involved in the attempt to throw Fischer over the railing, and the video surveillance is too poor to shed light on the identity of the perpetrators.

II

We first consider the validity of Rocha's conviction under the Assimilated Crimes Act ("ACA" or "Act"), 18 U.S.C. § 13. The ACA states, in relevant part:

> Whoever within or upon any [federal enclave] is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State . . . in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13(a). Using the ACA, the government charged Rocha with violating California Penal Code § 245, which punishes "assault by any means of force likely to produce great bodily injury." CAL. PEN. CODE § 245(a)(1). Whether the ACA properly assimilates the California assault statute is a question of law reviewed de novo. *See United States v. Souza*, 392 F.3d 1050, 1052 (9th Cir. 2004).

[1] Congress enacted the original version of the ACA in 1825, a time when federal law punished relatively few crimes. Due to the dramatic increase in federal criminal law,[3] we are regularly confronted with the question of whether the ACA has been rendered meaningless because, by its own language, the ACA applies only if the "act or omission" in question is

---

[3]*See* ABA Task Force on Federalization of Criminal Law, Report, (1998) (reprinted in 11 Fed. Senten. Rptr. 194 (1999)) ("The Task Force concluded that the evidence demonstrated a recent dramatic increase in the number and variety of federal crimes. Although it may be impossible to determine exactly how many federal crimes could be prosecuted today, it is clear that of all federal crimes enacted since 1865, over forty percent have been created since 1970 . . . . [M]uch of the recent increase in federal criminal legislation significantly overlaps crimes traditionally prosecuted by the states.").

*not* made punishable by "any enactment of Congress." 18 U.S.C. § 13(a); *see Souza*, 392 F.3d at 1052-53; *United States v. Waites*, 198 F.3d 1123, 1127-28 (9th Cir. 2000). In *Lewis v. United States*, 523 U.S. 155 (1998), the Supreme Court addressed when the ACA makes state law applicable to federal enclaves. In *Lewis*, the defendant urged a literal reading of the ACA, arguing that if any enactment by Congress punished the behavior at issue, the ACA could not assimilate the state law. The government, on the other hand, argued that the ACA could not assimilate the state law unless the federal and state law criminalized *precisely* the same behavior. *Id.* at 159-60, 162. Explaining that "[t]he ACA's basic purpose is one of borrowing state law to fill gaps in the federal criminal law that applies on federal enclaves," *id.* at 160, the Court declined to adopt either of the parties' competing interpretations. Instead, the Court established a two-part test for analyzing whether the ACA properly assimilates a particular state criminal law into federal law:

> [T]he ACA's language and its gap-filling purpose taken together indicate that a court must first ask the question that the ACA's language requires: Is the defendant's act or omission made punishable by *any* enactment of Congress. If the answer to this question is "no," that will normally end the matter. The ACA presumably would assimilate the statute. If the answer to the question is "yes," however, the court must ask the further question whether the federal statutes that apply to the "act or omission" preclude application of the state law in question . . . .

*Id.* at 164 (internal quotation marks, ellipses, and citations omitted) (emphasis in original). The Court gave three examples of when a federal enactment precludes application of a state law: if the state law "interfere[s]" with federal policy, "effectively rewrite[s]" a definition that "Congress carefully considered," or if the federal statute reveals an intent to occupy "so much of a field as would exclude use of the partic-

ular state statute at issue." *Id.* We consider each part of the test in turn.

A

**[2]** In applying this two-part test, we ask first whether Rocha's conduct was made punishable by any enactment of Congress. We easily conclude that his conduct was made punishable by an enactment of Congress, specifically by the federal assault statute, 18 U.S.C. § 113. The federal assault statute defines and punishes seven forms of assault: (1) assault with intent to commit murder, (2) assault with intent to commit any felony except murder, (3) assault with a dangerous weapon, (4) assault by striking, beating, or wounding, (5) simple assault, (6) assault resulting in serious bodily injury, and (7) assault resulting in substantial bodily injury to a person under the age of sixteen. 18 U.S.C. § 113(a)(1)-(7). "Because § 113 does not define assault, we have adopted the common law definitions: (1) a willful attempt to inflict injury upon the person of another, . . . or (2) a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm." *United States v. Lewellyn*, 481 F.3d 695, 697 (9th Cir. 2007) (internal quotation marks omitted).

**[3]** Rocha slammed Fischer to the ground by grabbing Fischer's feet out from under him, Rocha continued to fight with Fischer once Fischer was on the ground, and Rocha may have been one of the inmates who tried to throw Fischer over the railing. Rocha's bodily contact with Fischer is clearly grounds for an assault charge under one or more of the provisions of 18 U.S.C. § 113(a). Indeed, both parties agree that Rocha's conduct was punishable under the federal assault statute, although they disagree over which sections cover his acts: Rocha admits that his behavior could have been punished as assault by striking, beating, or wounding, or simple assault, 18 U.S.C. § 113(a)(4), (5), and the government, in

fact, charged Rocha with assault with intent to commit murder and assault with a dangerous weapon. *See id.* § 113(a)(1), (3).

**[4]** The government argues, however, that the state statute was properly assimilated under the ACA because the federal assault statute does not *fully* cover Rocha's conduct. The government argues that California Penal Code § 245, which punishes assault "by any means of force likely to produce great bodily injury," covers conduct that the federal statute does not by looking at the quantum of force involved in the attack. Because the federal statute requires an actual injury to result instead of a likely injury, the government argues that the federal statute does not adequately cover Rocha's conduct. Even if true, this argument is misplaced. Under the first prong of the *Lewis* test, we inquire only if there is *any* applicable federal law covering the conduct; we do not inquire into whether *every* conceivable charge against defendant is covered. We were confronted with the same question in *Hockenberry v. United States*, 422 F.2d 171 (9th Cir. 1970), when the defendant was convicted of assault under California Penal Code § 245, assimilated into federal law by the ACA. We held that because 18 U.S.C. § 113 and California Penal Code § 245 covered the same conduct, the California statute was not properly assimilated under the ACA. *Id.* at 173. Although our decision in *Hockenberry* predated *Lewis*, and so we concluded our inquiry when we determined that the federal assault statute punished the defendant's conduct, *Hockenberry* is still relevant to the first prong of the *Lewis* test. Because the federal assault statute punished the defendant's wrongful conduct, the ACA did not properly assimilate California Penal Code § 245. The fact that California law defines assault differently from the federal assault statute is irrelevant. As in *Hockenberry*, we have little difficulty concluding that Rocha's conduct is "made punishable by [an] enactment of Congress." 18 U.S.C. § 13.

### B

**[5]** Because we conclude that Rocha's actions were punishable under the federal assault statute, we turn to the second

prong of the *Lewis* inquiry: whether the federal enactment precludes the application of the state statute. The Court gave three examples of when a federal enactment precludes application of a state law: (1) application of the state law "would interfere with the achievement of a federal policy"; (2) application of the state law "would effectively rewrite an offense definition that Congress carefully considered"; or (3) the "federal statutes reveal an intent to occupy so much of a field as would exclude use of the particular state statute at issue." *Lewis*, 523 U.S. at 164. The Court also noted that "it seems fairly obvious that the Act will not apply where both state and federal statutes seek to punish approximately the same wrongful behavior—where, for example, differences among elements of the crimes . . . amount only to those of name, definitional language, or punishment." *Id*. at 165.

We think it "fairly obvious" as well that 18 U.S.C. § 113— which punishes "assaults within [the special] maritime and territorial jurisdiction" of the United States—precludes application of California Penal Code § 245. Section 245 cannot be assimilated under the ACA for three connected reasons. First, the federal assault statute's comprehensive definitions reveal Congress's intent to fully occupy the field of assault on a federal enclave. Second, both the California and federal assault statutes punish approximately the same wrongful behavior, counseling against application of the state statute through the ACA. Third, applying California's statute would effectively rewrite the punishments Congress carefully considered for assault on federal enclaves.

**[6]** The federal assault statute is a general assault statute, applicable to the "special maritime of territorial jurisdiction of the United States." 18 U.S.C. § 113. The statute begins by making it a crime to commit "an assault" in a federal enclave. It then sets forth detailed prescriptions for the punishment of different forms of assault:

Whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:

(1) Assault with intent to commit murder, by imprisonment for not more than twenty years.

(2) Assault with intent to commit any felony, except murder, . . . by a fine under this title or imprisonment for not more than ten years, or both.

(3) Assault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse, by a fine under this title or imprisonment for not more than ten years, or both.

(4) Assault by striking, beating, or wounding, by a fine under this title or imprisonment for not more than six months, or both.

(5) Simple assault, by a fine under this title or imprisonment for not more than six months, or both, or if the victim of the assault is an individual who has not attained the age of 16 years, by fine under this title or imprisonment for not more than 1 year or both.

(6) Assault resulting in serious bodily injury, by a fine under this title or imprisonment for not more than ten years, or both.

(7) Assault resulting in substantial bodily injury to an individual who has not attained the age of 16 years, by fine under this title or imprisonment for not more than 5 years, or both.

18 U.S.C. § 113(a)(1)-(7). This is a comprehensive statute. Although there are other formulations Congress might have

adopted, in § 113 Congress addressed key policy questions such as choosing to punish assault of a person younger than sixteen-years-old more severely than of an adult, to punish assault done with a murderous intent more severely than any other intent, and to punish actual injury instead of likely injury. By enacting a comprehensive federal assault statute, Congress demonstrated its "intent to occupy so much of a field as would exclude use of the particular state statute at issue." *Lewis*, 523 U.S. at 164.

The federal assault statute is comprehensive in a way the amalgam of federal theft statutes are not, as we explained in *Souza*, 392 F.3d at 1050. In *Souza*, we upheld a conviction under the ACA, finding that the federal national park regulations did not evidence an intent to occupy the field of law relating to burglary and breaking and entering of a vehicle parked on federal national park land. *Id.* at 1054-55. After the defendant forcefully entered and removed two duffle bags from a vehicle parked in Hawaii Volcanoes National Park, he was charged under the ACA, assimilating Hawaii Revised Statute 708-836.5, which punished unauthorized entry into a motor vehicle with the intent to commit a crime against a person. *Id.* at 1052. We acknowledged several federal enactments that could punish defendant's conduct: 18 U.S.C. § 661, "a general federal theft provision"; 36 C.F.R. § 2.30, another general provision prohibiting "unlawful possession of the property of another"; and 36 C.F.R. § 2.31, a provision prohibiting trespassing, tampering, and vandalism. *Id.* at 1053. At the second prong of the *Lewis* analysis, however, we determined that Congress did not intend these enactments to have a preclusive effect "[b]ecause the federal enactments are general in nature and do not address . . . specific conduct." *Id.* at 1054. Despite the applicable federal enactments, we found that there was a gap in federal law because no provision punished the unauthorized breaking, entering, and taking of property from a motor vehicle. The state statute properly filled a gap in federal law by punishing that specific behavior. *See id.* at 1055.

**[7]** Unlike *Souza*, in Rocha's case, there is simply no gap to fill. Rocha's actions are specifically covered by the federal assault statute in one way or another. In *Souza*, the federal statute covered theft generally, while the state statute specifically punished the act of breaking into a car and taking property. Here, not only does § 245 cover nearly identical ground as § 113, it is arguably more general than the federal assault statute because it punishes assault by means of force likely to produce great bodily injury while the federal statute defines specific forms of assault and requires actual injury or some kind of intent. *Compare* CAL. PEN. CODE § 245 *with* 18 U.S.C. § 113(a). The comprehensive nature of the federal assault statute reveals that Congress intended to occupy the field of assault at the exclusion of California's assault statute.

Along similar lines, there is no gap to fill in federal law because both the federal and state statutes "seek to punish approximately the same wrongful behavior," *Lewis*, 523 U.S. at 165, which precludes application of the state statute. In *Waites*, 198 F.3d at 1129, we reversed a conviction under the ACA, finding that federal post office regulations punished the same wrongful behavior as the state trespass statute and thus indicated an intent by Congress to dominate the field of trespass on post office property. The defendant in *Waites* was convicted of trespass under the ACA, assimilating the Oregon trespass statute, for sleeping in a post office. *Id.* at 1125. After we found his conduct punishable by a federal enactment (the defendant had received four separate citations pursuant to 39 C.F.R. § 232.1, "Conduct on Postal Property") we considered whether the post office regulations precluded application of the Oregon trespass statute. *Id.* at 1125, 1128. We reasoned that because the state law and federal regulation punished the same behavior, remaining on the premises after being instructed to leave, the federal regulations demonstrated "an intent to punish the defendant's conduct at the exclusion of the state statute." *Id.* at 1129.

**[8]** Even more clearly than in *Waites*, the California assault statute and the federal assault statute punish the same wrong-

ful behavior—assault. California Penal Code § 245(a)(1) punishes "[a]ny person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury." Cal. Pen. Code § 245. The federal assault statute likewise punishes "[a]ssault with intent to commit murder," "[a]ssault with a dangerous weapon, with intent to do bodily harm," and "[a]ssault by striking, beating, or wounding." 18 U.S.C. § 113(a)(1), (3), (4). Thus, we need not look far into Congress's legislative intent in passing the federal assault statute in concluding that it intended the federal assault statute to preclude application of state assault statutes on federal enclaves.

Finally, California Penal Code § 245 cannot be properly assimilated under the ACA because adopting California's definition of assault "would effectively rewrite an offense definition that Congress carefully considered." *Lewis,* 523 U.S. at 164. In many situations, the federal statute punishes assault more severely than the state statute. For example, both punish assault with a weapon: California punishes assault with a "deadly weapon" or "instrument" with a sentence of up to four years, but the federal statute punishes assault with a "dangerous weapon" with a sentence of up to ten years. *Compare* Cal. Pen. Code § 245 *with* 18 U.S.C. § 113(a)(3). California's statute does not consider intent, whereas the federal statute punishes assault done with murderous intent for up to twenty years and punishes assault done with felonious intent for up to ten years. *See id.* § 113(a)(1), (2).

**[9]** Most relevant to Rocha is that California distinguishes assault by whether the force used was *likely* to cause a great bodily injury, whereas the federal statute has no such distinction. The federal statute distinguishes assault by whether an *actual* serious injury occurred, whether a defendant had murderous intent, whether a defendant used a weapon, or whether a defendant beat, struck, or wounded the victim. *Compare* Cal. Pen. Code § 245 *with* 18 U.S.C. § 113(a). Under the fed-

eral definitional scheme, if the government cannot prove a defendant had a murderous or felonious intent, that the defendant used a dangerous weapon, or that the defendant caused serious bodily injury (all of which carry a maximum sentence of ten or twenty years), the government can charge a defendant only with "[a]ssault by striking, beating, or wounding" or "simple assault" (both of which carry a maximum sentence of six months). This was Rocha's situation. He used his hands to knock Fisher to the ground and continued fighting. There was some evidence that Rocha may have been one in the group that attempted to throw Fischer over the railing. The jury, however, acquitted Rocha of the charge of assault with murderous intent and the serious bodily injury that Fischer received resulted from his stabbing wounds. The government bypassed the lesser sentence charges of assault by striking, beating, or wounding or simple assault under the federal statute and attempted to convict Rocha under the California statute, which could result in a maximum term of imprisonment of four years, instead of six months under the federal statute. Since the "differences among elements of the crime[ ] [of assault]" between California Penal Code § 245 and 18 U.S.C. § 113 "amount only to those of name, definitional language, or punishment," the ACA does "not apply." *Lewis*, 523 U.S. at 165. Assimilating California Penal Code § 245, through the ACA, "effectively rewrite[s]" Congress's sentences and authorizes a longer punishment for the "same wrongful behavior." *Id.* at 164-65.

**[10]** We reverse Rocha's conviction under the ACA because it improperly assimilated California Penal Code § 245. Congress has enacted a comprehensive assault statute by which it has fully occupied the law of assault within federal enclaves.

## III

We next consider whether there is sufficient evidence to support Rocha's conviction of assault with a dangerous

weapon. 18 U.S.C. § 113(a)(3). As a general matter, whether an object "constitutes a dangerous weapon in a particular case is a question of fact for the jury" because it is an element of the offense and must be proved beyond a reasonable doubt. *United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994); *see also Medley v. Runnels*, 506 F.3d 857, 866-67 (9th Cir. 2007) (en banc) (whether a flare gun fit within California's definition of a firearm was a question of fact for the jury because determining that the defendant used a firearm was an element of the offense).

At trial, the government presented evidence that Rocha used his hands to force David Fischer to the ground. Rocha then brought a motion for judgment of acquittal on the charge of assault with a dangerous weapon. *See* FED. R. CRIM. P. 29(a) (stating "[a]fter the government closes its evidence . . . , the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction"). The court took the motion under consideration and submitted the case to the jury. The jury returned a special verdict, finding that Rocha used his hands, but not the concrete floor, as a dangerous weapon and convicting him of assault with a dangerous weapon. Rocha appeals the denial of his motion to dismiss under Rule 29 and claims that the evidence was insufficient to sustain his conviction. "We . . . review de novo the denial of [his] Rule 29 motion for acquittal, but the test to be applied is the same as for a challenge to the sufficiency of the evidence." *Riggins*, 40 F.3d at 1057.

The hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high. We must find that under the federal assault statute no rational jury could have convicted Rocha of assault with a dangerous weapon based on evidence that he used his hands alone to force Fischer to the ground. *See United States v. Barron-Rivera*, 922 F.2d 549, 552 (9th Cir. 1991). That is, we must conclude that, viewing the facts in the light most favorable to the government, "the

government's proof was insufficient as a matter of law to constitute a crime." *United States v. Moore*, 84 F.3d 1567, 1568 (9th Cir. 1996). In this case, we are called on to decide whether the evidence that Rocha assaulted Fischer with his bare hands alone constitutes assault with a dangerous weapon. This is a judgment as a matter of law. *See Riggins*, 40 F.3d at 1055 (upholding conviction under the federal assault statute where defendant used a belt and shoe as dangerous weapons because "as a matter of law a shoe and belt can be dangerous weapons, and . . . in this case the evidence was sufficient to sustain the verdict . . ."); *see also United States v. Tran*, 568 F.3d 1156, 1168 (9th Cir. 2009) (reversing defendant's convictions of conspiracy and possession with intent to distribute because "[t]he evidence against [the defendant] was . . . insufficient as a matter of law to support his conviction[s]"); *United States v. Ali*, 266 F.3d 1242, 1245 (9th Cir. 2001) (reversing defendant's convictions for bank-related offenses under 18 U.S.C. §§ 1014 and 1344(1) because "the government presented insufficient evidence as a matter of law for a rational trier of fact to find [an] essential element beyond a reasonable doubt").

**[11]** Section 113(a)(3) punishes "[a]ssault with a dangerous weapon, with intent to do bodily harm, and without just cause or excuse, by . . . imprisonment for not more than ten years . . . ." 18 U.S.C. § 113(a)(3). Title 18 gives neither a definition of "assault" nor "dangerous weapon." We adopted the common law definition of assault as "a willful attempt to inflict injury upon the person of another also known as an attempt to commit a battery," *Lewellyn*, 481 F.3d at 697 (internal quotation marks omitted), and we interpreted "dangerous weapon" to mean any object that is used in a way to inflict great bodily harm, *United States v. Smith*, 561 F.3d 934, 939 (9th Cir. 2009) (en banc); *Riggins*, 40 F.3d at 1057. *As we explained in Riggins*:

> The determination whether an object constitutes a "dangerous weapon" turns not on the object's latent

capability alone, but also on the manner in which the object was used. Objects that are not dangerous weapons *per se* are deemed to be "dangerous weapons" within the meaning of [18 U.S.C. § 113(a)(3)] when used in a manner likely to endanger life or inflict great bodily harm. Thus, the term "dangerous weapon" is not restricted to such obviously dangerous weapons as guns, knives, and the like, but can include virtually any object given appropriate circumstances.

*Riggins*, 40 F.3d at 1057 (quoting *United States v. Guilbert*, 692 F.2d 1340, 1342 (11th Cir. 1982) (citations omitted)).

**[12]** Recently, in *Smith*, we reaffirmed *Riggins* and adopted a multi-faceted test for determining whether an object is a dangerous weapon. In *Smith*, we held that a knife made from a prisoner's melted-down plastic trays qualified as a dangerous weapon and that a rational juror could have found that the defendant used his crude weapon in a way to cause great bodily harm. *Smith*, 561 F.3d at 939. We explained, "[a]n object is a dangerous weapon within the meaning of 18 U.S.C. § 113(a)(3) if it is either inherently dangerous or otherwise used in a manner likely to endanger life or inflict great bodily harm." *Id.* at 939 (internal quotation marks omitted).

Our own cases, and those of our sister circuits, have focused on the question of when objects that are not manufactured to be used as weapons may, nevertheless, be utilized as a "dangerous weapon." In *Riggins*, for example, we held that there was sufficient evidence to support the conviction of a mother who beat her two-year-old son with a belt and shoe. Although belts and shoes are not weapons *per se*, we concluded that "the belt and shoe were dangerous weapons in the manner in which they were used." *Riggins*, 40 F.3d at 1057. A long line of cases confirm that objects that have perfectly peaceful purposes may be turned into dangerous weapons and that such use may be punished under the federal assault stat-

ute. *See*, *e.g.*, *United States v. LeCompte*, 108 F.3d 948, 952 (8th Cir. 1997) (rock and phone); *United States v. Gibson*, 896 F.2d 206, 209 n.9 (6th Cir. 1990) (speeding car); *United States v. Hollow*, 747 F.2d 481 (8th Cir. 1984) (pushing victim with both hands while holding a knife); *United States v. Wycoff*, 545 F.2d 679 (9th Cir. 1976) (metal pipe or wooden stick); *United States v. Anderson*, 425 F.2d 330 (7th Cir. 1970) (speeding car); *Brundage v. United States*, 365 F.2d 616 (10th Cir. 1966) (iron pipe); *United States v. Johnson*, 324 F.2d 264 (4th Cir. 1963) (metal and plastic chair); *see also Hickey v. United States*, 168 F. 536 (9th Cir. 1909) (revolver used as a club was a dangerous weapon before federal assault statute enacted). More recently, in *United States v. Steele*, 550 F.3d 693, 699 (8th Cir. 2008), the Eighth Circuit held that there was sufficient evidence for the jury to determine that the defendant's tennis shoes were used as dangerous weapons when the defendant repeatedly kicked a federal officer's torso. *See also United States v. Anchrum*, 590 F.3d 795, 801 (9th Cir. 2009) (car, truck, automobile, or vehicle can constitute a dangerous weapon under 18 U.S.C. § 111(b)).

We are faced with a more difficult question than whether iron pipes, chairs, shoes, or belts may be converted into dangerous weapons. All of these cases focus on "objects" and do not consider whether body parts, or, more specifically, bare hands can be considered dangerous weapons by a rational trier of fact. We have identified only two cases in the federal courts of appeals, one from the Fourth Circuit and one from the Eighth Circuit, that have considered the issue of whether body parts can be considered dangerous weapons under the federal assault statute. Both involved teeth.

In *United States v. Sturgis*, 48 F.3d 784 (4th Cir. 1995), a prisoner who was HIV positive bit a correctional officer at the Lorton Reformatory and was convicted of assault with a dangerous weapon. After noticing the various innocuous items that courts had considered dangerous items, a majority of the

court rejected a "mechanical" test for whether any particular object was used as a dangerous weapon:

> it must be left to the jury to determine whether, under the circumstances of each case, the defendant used some instrumentality, object, or (in some instances) a part of his body to cause death or serious injury. This test clearly invites a functional inquiry into the use of the instrument rather than a metaphysical reflection on its nature.

*Id.* at 788. The court concluded that "teeth may also be a dangerous weapon if they are employed as such." *Id.* The court held that substantial evidence existed for the jury to find that the defendant used teeth as a dangerous weapon—the defendant was HIV positive and used his teeth, potentially, as a means of transmitting the HIV virus. *Id.* Declining to establish a bright-line rule about body parts used as weapons under the federal statute, the court decided to leave the determination as to whether body parts could be dangerous weapons to the jury. *Id.* Judge Hall dissented. In his view, Congress's use of the word "weapon" "connote[d] an object or instrument and it strains the boundaries of ordinary usage to call body parts 'objects.' Punch, kick or bite another, and you are guilty of assault; strike or stab another with an object, and you are guilty of assault with a weapon." *Id*. at 789 (Hall, J., dissenting).

The Eighth Circuit has also found that the mouth and teeth could be dangerous weapons. *United States v. Moore*, 846 F.2d 1163 (8th Cir. 1988). In *Moore*, the defendant was a prisoner who had bitten two correctional officers in multiple places, threatening to kill the officers. Although Moore was HIV positive, the court declined to rest its judgment on that fact. It pointed to a doctor's testimony that a human bite is "potentially 'more dangerous than a dog bite' . . . and that it can be 'a very dangerous form of aggression.' " *Id*. at 1167. It continued that "the evidence was sufficient to support the

finding that Moore's mouth and teeth were a deadly and dangerous weapon, regardless of the presence or absence of AIDS." *Id.* at 1168. *See also United States v. Studnicka*, 450 F. Supp. 2d 680 (E.D. Tex. 2006), *appeal dismissed*, 236 Fed. App'x. 129 (5th Cir. 2007) (upholding a sentence increase for a conviction of HIV-positive prisoner who bit correctional officer).

The state courts have divided over the question of whether body parts can constitute dangerous or deadly weapons for purposes of their respective assault and battery statutes. Most states have determined that body parts cannot be considered a dangerous or deadly weapon. *State v. Flemming*, 19 S.W.3d 195 (Tenn. 2000) (fists and feet); *People v. Owusu*, 712 N.E.2d 1228 (N.Y. 1999) (teeth); *State v. Bachelor*, 575 N.W.2d 625 (Neb. Ct. App. 1998) (teeth); *Ex Parte Cobb*, 703 So. 2d 871 (Ala. 1996) (fists or other body parts); *People v. Aguilar*, 945 P.2d 1204 (Cal. 1997) (bare hands or feet); *State v. Townsend*, 865 P.2d 972 (Idaho 1993) (hands); *State v. Frey*, 505 N.W.2d 786 (Wis. Ct. App. 1993) (hands); *Dixon v. State*, 603 So. 2d 570 (Fla. Dist. Ct. App. 1992) (bare hands); *State v. Gordon*, 778 P.2d 1204 (Ariz. 1989) (fists); *Seiter v. State*, 719 S.W.2d 141 (Mo. Ct. App. 1986) (hands); *People v. Bias*, 475 N.E.2d 253 (Ill. App. Ct. 1985) (a sharp fingernail); *Roney v. Commonwealth*, 695 S.W.2d 863 (Ky. 1985) (fists and body parts); *Commonwealth v. Davis*, 406 N.E.2d 417 (Mass. Ct. App. 1980) (fists and teeth); *People v. Van Diver*, 263 N.W.2d 370 (Mich. Ct. App. 1977) (bare hands); *State v. Ireland*, 447 P.2d 375 (Utah 1968) (hands); *State v. Calvin*, 24 So. 2d 467 (La. 1945) (bare hands and teeth); *Bean v. State*, 138 P.2d 563 (Okla. Crim. App. 1943) (fists); *Warren v. State*, 114 S.W.705 (Ark. 1908) (fists). In *Owusu*, for example, the New York Court of Appeals addressed whether the defendant, who nearly severed the victim's finger by biting it, had used a "dangerous instrument." The court observed that its " 'use-oriented approach' has always been directed at understanding if an instrument is (or can be) '*dangerous*'; it has not been used as a guide to deter-

mine if the means by which the victim was injured was an '*instrument*.' " *Owusu*, 712 N.E.2d at 1231-32. The court read the statute to "[i]ncrease[ ] criminal liability . . . because the actor has upped the ante by employing a device to assist in the criminal endeavor." *Id.* at 1232. Here, "Mr. Owusu's teeth came with him," and the court declined to find his teeth a dangerous instrument. *Id.* The Tennessee Supreme Court in *Flemming* reached a similar conclusion. Flemming had kicked the victim and beat him with his fists before robbing him. He was charged with "especially aggravated robbery" because he used a deadly weapon (fists and feet) to commit the crime. The Tennessee Supreme Court explained that if fists and feet are deadly weapons, then there would be no distinction between simple and aggravated offenses. *Flemming*, 19 S.W.3d at 197. The court pointed out that

> to prove aggravated assault, the State would need only show that, during the commission of a simple assault, the defendant displayed a deadly weapon. Under the State's broad definition of 'deadly weapon,' the defendant's fists and feet would inevitably be displayed. Thus, the defendant becomes both the perpetrator and the deadly weapon, the simple assault becomes aggravated assault, and the misdemeanor becomes a felony.

*Id.* at 198; *see also Bachelor*, 575 N.W.2d at 632 ("Declaring body parts dangerous instruments makes the increased penalty for using a dangerous instrument meaningless and creates ambiguity, if not outright duplication, between second and third degree assault under Nebraska law.").

Other states, although a clear minority, have allowed body parts to be considered dangerous or deadly weapons. *State v. Allen*, 667 S.E.2d 295 (N.C. Ct. App. 2008) (hands); *State v. Bennett*, 493 S.E.2d 845 (S.C. 1997) (hands and fists); *People v. Ross*, 831 P.2d 1310 (Colo. 1992) (hands); *State v. Grumbles*, 411 S.E.2d 407 (N.C. Ct. App. 1991) (fists); *Turner v.*

*State*, 664 S.W.2d 86 (Tex. Crim. App. 1983) (hands and feet); *State v. Zangrilli*, 440 A.2d 710 (R.I. 1982) (hands); *Ellis v. State*, 224 S.E.2d 799 (Ga. Ct. App. 1976) (hands and floor); *Pulliam v. State*, 298 So. 2d 711 (Miss. 1974) (fists and teeth); *State v. Born*, 159 N.W.2d 283 (Minn. 1968) (fists and body parts); *State v. Heinz*, 275 N.W. 10 (Iowa 1937) (hands and fists). In one recent case, the North Carolina Court of Appeals held that hands could be considered a deadly weapon for purposes of the assault statute "depending upon the manner in which they were used and the relative size and condition of the parties." *Allen*, 667 S.E.2d at 298. The court thus pointed to the fact that the defendant was seven inches taller and outweighed the victim by forty pounds as sufficient evidence of use a deadly weapon. *Id.* at 301. *But see Owusu*, 712 N.E.2d at 1232 (rejecting a "sliding scale of criminal liability" based on "the size of the perpetrator, his weight, strength, etc., as well as any infirmities or frailties of the victim").

Here, the jury found that Rocha used only his bare hands in attacking Fischer. At trial, the government argued that Rocha used both his hands and the concrete floor as dangerous weapons in assaulting Fischer. The jury was instructed in a special verdict to check whether it unanimously found beyond a reasonable doubt that Rocha used "his hands" or "a concrete floor" or both as a dangerous weapon. Rejecting the government's claim that Rocha used the concrete floor as a weapon, the jury found Rocha used only his hands as a weapon and convicted him of assault with a dangerous weapon. The jury also understood that the parties stipulated that Rocha did not stab Fischer and that Fischer's stabbing wounds caused his death.

**[13]** Although we appreciate the simplicity of the Fourth Circuit's decision to leave all questions of what constitutes a "dangerous weapon" to the jury, in the end we do not think the statute will bear such an interpretation. Section 113(a)(3) punishes "[a]ssault with a dangerous weapon with intent to do

bodily harm." There are three separate elements described in this phrase: (1) an assault, (2) the use of a dangerous weapon, and (3) the intent to do bodily harm. We do not think that we can give independent meaning to each of these terms if the mere use of a body part is a "dangerous weapon." We find it difficult to see how someone could be accused of assault without using a body part in some way. If the assault is made with the intent to do bodily harm, it appears that *every* assault with intent to do bodily harm would satisfy § 113(a)(3) without any independent showing of the use of a "dangerous weapon." This reading would blur the line Congress drew between simple assault and various forms of aggravated assault subject to a more severe penalty.

**[14]** We do not think the statutory scheme allows such a construction. Congress has separately punished "assault by striking, beating, or wounding;" "assault resulting in serious bodily injury;" and "simple assault." 18 U.S.C. § 113(a)(4), (5), and (6). As we think of the potential uses of various parts of the body—head butting, body slamming, scratching, punching, strangling, elbowing, kneeing, kicking—each assaultive act can be accomplished without an additional weapon, tool, or equipment such as helmets, pads, or shoes. Yet each act becomes more potent with the use of a separate implement. We think that when Congress used the term "dangerous weapon" it contemplated generally the situation in which the defendant used a weapon or utilized some other object as a weapon to augment the force of his physical assault. We thus agree with Judge Hall's observation that, in general, "a weapon is something with which one can 'be armed,' something one can pick up and use. Beer bottles, chairs, telephone receivers swung on a cord—all these clearly come within the ordinary meaning of weapons." *Sturgis*, 48 F.3d at 790-91 (Hall, J., dissenting). Hands used to pull on ankles—as awful as it was in this situation—were not a "dangerous weapon."

IV

**[15]** We reverse Rocha's conviction under the ACA because the ACA improperly assimilated California Penal Code § 245. We also reverse his conviction under 18 U.S.C. § 113(a)(3) because there was insufficient evidence as a matter of law that Rocha used a dangerous weapon.

REVERSED.