**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 15, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ANDRE J. TWITTY,

    Defendant - Appellant.

No. 20-1083
(D.C. No. 1:19-CR-00344-RBJ-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT***
_____

Before **PHILLIPS**, **EBEL**, and **CARSON**, Circuit Judges.
_____

State statutes assimilated by the Assimilated Crimes Act ("ACA") in effect become federal statutes. See United States v. Kiliz, 694 F.2d 628, 629 (9th Cir. 1982) (citing Johnson v. Yellow Cab Transit Co., 321 U.S. 383 (1944)). That means if a Defendant commits a crime on federal land or in a federal building, and that crime is not already a federal offense, the ACA acts as a gap-filler allowing the government to apply state law on federal property. See Lewis v. United States, 523 U.S. 155, 159–66 (1998).

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

On the eve of his release from federal prison, Defendant Andre J. Twitty threatened a Bureau of Prisons ("BOP") disciplinary officer. A jury convicted Defendant for violating Colorado's stalking statute as assimilated by the ACA. Defendant appeals, arguing that the ACA did not properly assimilate Colorado's stalking statute and even if it did, the district court could not interpret the Colorado statute in the same ways it would other federal statutes. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.

While serving a sentence in federal prison for making threats, Defendant threatened Shery Beicker-Gallegos. Before threatening Beicker-Gallegos, Defendant threatened the prison's warden, writing in a cop-out that he would "deal with all upon release."[1] In this cop-out Defendant also referenced a former Colorado inmate who murdered the director of the Colorado Department of Corrections shortly after release. In response, a staff member drafted an incident report (also known as a "shot") charging Defendant with threatening another with bodily harm. Beicker-Gallegos—a BOP disciplinary hearing officer—presided over Defendant's disciplinary hearing on that charge. At the hearing, Defendant emphasized that upon his impending release he would shoot as many people as possible and then commit suicide. Based on Defendant's tone and body language, Beicker-Gallegos became concerned Defendant might follow through on these threats, given his impending

---

[1] A cop-out is "a means by which inmates may send informal communications through internal prison channels to BOP staff."

2

release.  So she drafted another incident report charging Defendant with making even more threats of bodily injury.

At this point, Defendant's behavior became cyclical—he would make a threat, a staff member would charge him, and then, angered by the charge, he would make another threat.  So after Beicker-Gallegos charged Defendant, he wrote a cop-out saying:

> How do you stop a man with a suicide plan . . . you can't. . . .
> So write another shot! Then I will send you some more and
> let's see who wins. . . . Dumb ass b\*\*ch.

He addressed this cop-out to Beicker-Gallegos, referring to her by name and also as a "white DHO b\*\*ch."  He also made several statements noting that he had access to guns and bombmaking materials.[2]  He included a copy of the incident report in the

---

[2] We see no need to memorialize every vulgar comment Defendant made on his plans to rape and kill.  But for the sake of context, some of Defendant's comments included the following:

> Let's see, writing these bull\*\*\*t shots. Are going to stop me
> from going down to the river! Taking a shovel, digging up those
> 3 stainless steel boxes that I buried in 1998! The ones the
> bullshit FBI still cannot find. Really! Did writing shots in
> 1997 stop me from leaving the bullshit BOP and gathering up
> bombmaking material. F\*\*k no!

> Will writing shots stop me from going to Chicago and get a
> AK-47 pistol? This is my 5th time leaving the bull\*\*\*t BOP. I
> didn't give a f\*\*k the first four times.

> Come on! Tell me what the f\*\*k are these shots supposed to
> do, except MOTIVATE ME.

3

cop-out, and on it he wrote "lets play! Like I said Motivation!" He also attached ten photographs of guns and ammunition.

After a new hearing officer adjudicated Beicker-Gallegos's charge, Defendant sent a cop-out to that hearing officer. On that cop-out, Defendant wrote "Google home address" next to Beicker-Gallegos's name. He also wrote "all that matters now are my rifles and google! Now come outside and stop me! I dare you!"

Months later, BOP staff charged Defendant with making renewed threats to kill BOP staff and their children. Beicker-Gallegos adjudicated the new charge and found Defendant guilty. In response, Defendant sent another cop-out addressed to Beicker-Gallegos. He made statements expressing he did not "give a f**k" about the reports and charges. Again, he threatened to exact revenge once released and circled several BOP personnel's names writing "Google" next to them.

Defendant then sent yet another cop-out, referencing Beicker-Gallegos by name noting that he planned to "encourage all real black men to kill all white racist police and prison staff." Soon after, BOP personnel charged Defendant again for threatening another with bodily harm related to another incident. Beicker-Gallegos adjudicated that charge, again, finding Defendant guilty. Defendant responded just as he had in the past—he sent a cop-out letter to Beicker-Gallegos referencing his plan to exact revenge on white America and noting that these charges just motivated him. Beicker-Gallegos received this cop-out and filed yet another charge against Defendant for threatening another with bodily harm. In total, BOP personnel charged Defendant five times for threatening another with bodily injury.

4

Having seen enough, the government obtained an indictment alleging Defendant violated Colorado's stalking statute—C.R.S. § 18-3-602(1)(2) ("Colorado statute") as assimilated by the ACA. The indictment named Beicker-Gallegos as the recipient of Defendant's threat. Defendant moved to dismiss, arguing the Colorado statute was unconstitutional because the statute, by its terms, lacked a mens rea requirement. But the government had included an intent requirement in the indictment. And the district court determined that, under our jurisprudence, it should interpret the Colorado statute as having a constitutionality sufficient mens rea requirement. The case proceeded to trial where the district court, consistent with its ruling, instructed the jury that the government had to prove "defendant intended the recipient of the threat to feel threatened." The jury found Defendant guilty.

Defendant moved for a new trial six days after the jury verdict, arguing the district court lacked jurisdiction because 18 U.S.C. § 2261A punished approximately the same conduct as the Colorado statute. And so the ACA did not properly assimilate the Colorado statute. See Lewis, 523 U.S. at 165 (the ACA does "not apply where both state and federal statutes seek to punish approximately the same wrongful behavior."). The district court denied his motion. About a month later, Defendant moved to dismiss the indictment, arguing 18 U.S.C. § 115(a)(1)(B) also punished approximately the same conduct as the Colorado statute. The district court denied Defendant's motion, finding it untimely because Defendant's argument presented a non-jurisdictional challenge that he should have raised pretrial. Following sentencing and entry of judgment, Defendant appealed his conviction.

II.

Defendant makes four claims on appeal: (1) the ACA does not properly assimilate the Colorado statute; (2) the district court erred in interpreting the Colorado statute as containing a mens rea requirement; (3) the district court improperly instructed the jury; and (4) the government presented insufficient evidence to support Defendant's conviction. We address each claim in turn, affirming the district court on every issue.

A.

We review a timely objection to the assimilation of a statute de novo. United States v. Rocha, 598 F.3d 1144, 1147 (10th Cir. 2010).

Defendant argues the district court erred in denying his motions about improper assimilation.[3] First, he argues he objected pretrial to the ACA's assimilation of the Colorado statute. He did not.[4] So we proceed to his second

---

[3] Defendant argues the ACA did not assimilate the Colorado statute because two federal statutes punish approximately the same behavior as the Colorado statute—18 U.S.C. §§ 2261A and 115. We need not address whether such an overlap exists, because Defendant failed to timely object below or show good cause for the delay.

[4] True, Defendant did mention the scope of ACA assimilation in his reply to the government's response to his own pretrial motion to dismiss. But in that reply, Defendant argued the ACA did not assimilate the Colorado statute because the Colorado statute *conflicted* with federal policy. Defendant neglected to mention either § 2261(A) or § 115. After the trial, Defendant's position evolved—he argued the Colorado statute and federal law are too *similar*. He filed a motion for new trial six days after the verdict, arguing that the ACA did not assimilate the Colorado statute because § 2261(A) was sufficient to punish his conduct. Later, he argued that § 115(a)(1)(B) also punished approximately the same conduct as the Colorado statute. Because Defendant made a different argument and failed to reference §

6

argument—that his failure to object pretrial does not matter because assimilation presents a non-waivable jurisdictional issue.

As we see it two alternatives exist here: (1) the ACA properly assimilated the Colorado statute because the Colorado statute does not punish approximately the same behavior as federal law; or (2) the ACA did not properly assimilate the Colorado statute because both state and federal statutes seek to punish approximately the same behavior. Under option one, the district court would have jurisdiction under the ACA. Under option two, the district court would have jurisdiction under the federal statutes—18 U.S.C. §§ 2261A or 115(a)(1)(B). Either way, the district court had jurisdiction over Defendant's purported violations of federal law within the judicial district. So jurisdictionally, whether the government charged the offense under the ACA or another provision of federal law did not matter.

Moreover, in this context Defendant's challenge to assimilation resembles a challenge to an indictment.[5] And a challenge to an indictment is not jurisdictional. See Hall, 979 F.2d at 322–23 (concluding that even if a court mistakenly based jurisdiction on the ACA, rather than a provision of federal law, that error did not

2261(A) or § 115 before trial, we find he first objected to ACA's assimilation of the Colorado statute post-trial.

[5] United States v. Key, 599 F.3d 469, 476–77 (5th Cir. 2010); United States v. Todd, 139 F.3d 896, 1998 WL 112562, at *3 (4th Cir. 1998) (unpublished table decision); United States v. Hall, 979 F.2d 320, 322–23 (3rd. Cir. 1992); Hockenberry v. United States, 422 F.2d 171, 173–74 (9th Cir. 1970).

compel reversal because improper assimilation was analogous to a citation of the wrong statute in an indictment and did not prejudice the defendant).

The Supreme Court has not expressly analyzed whether assimilation presents a jurisdictional issue. But in Lewis, a jury convicted the defendants of first-degree murder under Louisiana law as assimilated through the ACA. 523 U.S. at 158–59. The Supreme Court found the ACA did not properly assimilate the Louisiana statute and remanded the case for resentencing. Id. at 172–73. The Court's silence on the jurisdictional argument demonstrated the non-jurisdictional nature of the defendants' assimilation appeal. Key, 599 F.3d at 476–77 ("The nonjurisdictional character of any assimilation error [was] reinforced, if not directly ruled on, by the Supreme Court's disposition in Lewis, which merely reversed and remanded for resentencing after the Court found an improper assimilation."). Thus, Defendant's challenge here did not present a jurisdictional issue.

Because the basis for Defendant's motion—improper assimilation—is non-jurisdictional, existed pretrial, and the district court could have resolved the motion without a trial on the merits, Defendant had to make his motion pretrial. Fed. R. Crim. P. 12(b)(3)(B). So unless he can show good cause for not doing so, Defendant's failure to make his motion pretrial leaves us unable review his challenge. See Bowline, 917 F.3d at 1237. But Defendant does not show good cause for his failure to make this argument pretrial. In fact, he does not even try. So we affirm the district court's denial of Defendant's post-trial motions on this issue.

8

## B.

By its terms, Colorado's stalking statute does not have a mens rea requirement. So the district court interpreted it as requiring intent. We first address whether federal courts can interpret statutes to include a mens rea requirement. Concluding they can, we next address whether federal courts can interpret a state statute assimilated by the ACA as requiring intent. We review the interpretation and constitutionality of a state statute de novo. Camfield v. City of Okla. City, 248 F.3d 1214, 1221 (10th Cir. 2001); Cent. Kan. Credit Union v. Mut. Guar. Corp., 102 F.3d 1097, 1104 (10th Cir. 1996).

The Supreme Court generally interprets statutes to include mens rea requirements even where, by their terms, the statutes do not contain one. Elonis v. United States, 575 U.S. 723, 734 (2015) (Courts generally interpret [] criminal statutes to include broadly applicable scienter requirements, even where the statute . . . does not contain them." (alteration in original) (internal citation and quotation marks omitted)). And we do the same. United States v. Heineman, 767 F.3d 970, 978–82 (10th Cir. 2014) (interpreting 18 U.S.C. § 875(c), which criminalized the sending of an interstate threat but did not specify a mens rea requirement, to require that the defendant subjectively intended the recipient feel threatened.). Because federal courts can generally interpret statutes to include mens rea requirements, we next address whether they can interpret an assimilated *state* statute to include a subjective intent requirement.

9

The district court believed it could and, relying on Elonis, interpreted Colorado's stalking statute as including a mens rea requirement—an intent to instill fear in the threat's recipient. Defendant attempts to distinguish Elonis and Heineman from this case arguing that Elonis and Heineman involved violations of a federal statute while this case involves violation of a state statute. And, he argues, Colorado's interpretation of the stalking statute prevents the district court from including a subjective intent requirement here because a state's interpretation of its own statutes binds federal courts.[6] See Brown v. Buhman, 822 F.3d 1151, 1161 n.6 (10th Cir. 2016). But in making that argument, Defendant does not account for the effect of the ACA.

The ACA adopts state law so the government may punish a crime committed on federal land "in the way and to the extent that it would have been punishable if committed within the surrounding jurisdiction." United States v. Sain, 795 F.2d 888, 890 (10th Cir. 1986). In adopting these state laws, the ACA adopts only the offenses' elements and ranges for punishment. Id. Otherwise, federal courts may

---

[6] Even if Defendant were correct and we had to defer to Colorado's interpretation of the Colorado statute, Defendant has not persuaded us that the Colorado state courts, post-Heineman and Elonis, would have done things any differently. See People In Interest of R.D., 464 P.3d 717, 733–34 (Colo. 2020) (en banc) (avoiding a Constitutional challenge to the Colorado harassing communication statute by interpreting the statute to include a subjective intent element—that the defendant subjectively intended to threaten). See also People v. Smith, 620 P.2d 232, 238 (Colo. 1980) (en banc) ("It is also true that a statute will be presumed to conform to constitutional requirements . . . and a culpable mental state will be implied from a particular statute which does not contain an intent element on its face.").

10

interpret an assimilated statute as it would any other federal statute "because the assimilated state law, in effect becomes a federal statute."[7] Kiliz, 694 F.2d at 629 (citing Johnson, 321 U.S. 383).

As explained above, federal courts can generally "interpret" a statute to include a mens rea requirement to save the constitutionality of the statute if the statute, by its terms, does not have one.[8] The ACA assimilated the Colorado statute and thus adopted its elements and ranges for punishment. Once assimilated, the district court was free to interpret the Colorado statute's elements in the same way it would any other federal statute. And it did just that. For these reasons, the district

---

[7] Defendant cites a series of cases which addressed the scope of the ACA. See United States v. Johnson, 967 F.2d 1431, 1434 (10th Cir. 1992). But these cases are inapplicable here because they address when a defendant's act or omission is punishable by state law *and* Congressional enactment. See id.; Lewis, 523 U.S. at 164. When overlap does occur, the courts should consider, among other things, whether the "state law would effectively rewrite an offense definition that Congress carefully considered." Lewis, 523 U.S. at 164. For reasons described above, Defendant waived his argument that state law and congressional enactment punished approximately the same conduct. So for purposes of this argument, we assume the ACA assimilated the Colorado statute. For that reason, these cases are inapplicable and unpersuasive.

[8] Defendant argues the district court redefined the Colorado statute by interpreting it to include a mens rea requirement. And he argues that Williams v. United States, 327 U.S. 711 (1946), prohibits the court from redefining or enlarging state statutes under the ACA. Not so. Williams stands for the proposition that, under the ACA, a conflicting state statute cannot redefine or enlarge an offense defined by Congress. Id. at 718. It in no way limits the court's power to interpret state statutes properly assimilated. Even still, the district court neither redefined nor enlarged the Colorado statute by interpreting it to include a mens rea requirement because that interpretation did not alter the statute's enumerated elements.

11

court did not err in interpreting the Colorado statute to require proof that Defendant intended to instill fear in the threat's recipient.

C.

The district court instructed the jury as follows:

To find the defendant committed the offense of Stalking (Credible Threat and Repeated Communication), you must be convinced that the government has proved each of the following elements beyond a reasonable doubt.

1. The defendant knowingly made a credible threat to another person, either directly, or indirectly through a third person;

2. In connection with the threat, the defendant repeatedly made any form of communication with that person, a member of that person's immediate family, or someone with whom that person was having or previously had a continuing relationship, regardless of whether a conversation ensued;

3. Based on the threats, physical action, or repeated conduct, a reasonable person would be in fear for the person's safety or the safety of his/her immediate family or of someone with whom the person has or has had a continuing relationship; and

4. The defendant intended the recipient of the threat to feel threatened. (as defined in Instruction No. 12).

Defendant objects to the district court's inclusion of the third element—the objective reasonableness standard.[9] We review jury instructions de novo to determine whether, as a whole, they correctly state the law. United States v. Gorrell, 922 F.3d 1117, 1121–22 (10th Cir. 2019). We reverse only if we have "substantial

---

[9] The first two elements are nearly verbatim the Pattern Criminal Jury instruction drafted by the Colorado Supreme Court, See COLJI-Crim. 3:602 (2019), and, for reasons explained above, the district court permissibly read in element four when interpreting the Colorado statute.

12

doubt that the jury was fairly guided." Id. at 1122 (quoting United States v. Little, 829 F.3d 1177, 1181 (10th Cir. 2016)).

We have held that a "true threat" prosecution requires "proof that a reasonable person would understand the communication to be a threat." United States v. Stevens, 881 F.3d 1249, 1253 (10th Cir. 2018). Under this standard, "[t]he question is whether those who hear or read the threat reasonably consider that an actual threat has been made." Id. (alteration in original) (quoting United States v. Dillard, 795 F.3d 1191, 1199 (10th Cir. 2015)). The Colorado statute captures this requirement by defining stalking as when a person knowingly "[m]akes a credible threat to another person. . . ," and defining a "credible threat" as "a threat, physical action, or repeated conduct that would cause *a reasonable person* to be in fear for the person's safety or the safety of his or her immediate family."[10] C.R.S.A. § 18-3-602 (emphasis added). So the district court's reasonable person instruction aligned with the Colorado statute's language.

---

[10] The Colorado statute does not require the government prove that Beicker-Gallegos felt threatened. Nor do cases interpreting Colorado or Federal law. See People In Interest of R.D., 464 P.3d at 733 ("[A] listener's subjective reaction, without more, should not be dispositive of whether a statement is a true threat."). As much as Defendant argues the government bore that burden, he is wrong. The proper inquiry is whether a reasonable person would understand the communication to be a threat. Stevens, 881 F.3d at 1253. Guesses about whether "a particular reader or listener will react with fear to particular words is far too unpredictable a metric for First Amendment protection." People In Interest of R.D., 464 P.3d at 733. So although "the subjective reaction of a statement's target or foreseeable recipients will be an important clue as to whether the message is a true threat," the government does not have to prove beyond a reasonable doubt that the recipient felt threatened. Id. at 733.

13

Defendant remains unsatisfied. He argues that <u>Elonis</u> did away with the reasonable person standard in a way which prohibited the instruction here. We disagree. In <u>Elonis</u>, the Supreme Court disavowed use of a reasonable person standard when looking at a defendant's state of mind, not a victim's. 575 U.S. at 740. The <u>Elonis</u> district court instructed the jury that the defendant could be found guilty if "a reasonable person would foresee that the statement would be interpreted" as a threat. <u>Id.</u> at 731. The Supreme Court held the district court erred because "[f]ederal criminal liability generally does not turn solely on the results of an act without considering [a] defendant's mental state." <u>Id.</u> at 740. As explained above, <u>Elonis</u> imposed an intent element in place of the lesser reasonable person standard.

Defendant plucks a quote from <u>Elonis</u> which reads, "[h]aving liability turn on whether a reasonable person regards the communication as a threat—regardless of what the defendant thinks—reduces culpability on the all-important element of the crime to negligence . . . and we have long been reluctant to infer that a negligence standard was intended in criminal statutes." <u>Id.</u> at 738 (internal citations and quotation marks omitted). But this quote, despite Defendant's contention otherwise, does not help him. The district court did not use the reasonable person standard to define Defendant's intent. So Defendant's reliance on cases disavowing such a use is misplaced. The district court properly instructed the jury in accordance with the Colorado statute's language and federal law, and thus did not err.

D.

Defendant argues the government produced insufficient evidence to sustain a conviction under the Colorado statute because it only proved Beicker-Gallegos received one of Defendant's threats. We review the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to the verdict and taking all reasonable inferences in support of the verdict. United States v. Wright, 506 F.3d 1293, 1297 (10th Cir. 2007).

At trial, Beicker-Gallegos testified she recalled receiving only one of Defendant's threats—the last one, which motivated her charging Defendant with threatening bodily injury. Beicker-Gallegos could not recall whether she had seen Defendant's four other threats. Defendant argues that under the Colorado statute the government had to prove Beicker-Gallegos contemporaneously received repeated threats. Defendant is wrong. The Colorado statute specifies that:

> [a] person commits stalking if directly, or indirectly through another person, the person knowingly . . . (b) [m]akes a credible threat to another person and, in connection with the threat, repeatedly makes any form of communication with that person, a member of that person's immediate family, or someone with whom that person has or has had a continuing relationship, regardless of whether a conversation ensues . . .

C.R.S.A. § 18-3-602(1)(b). The Colorado statute requires *a* credible threat and then repeated forms of communication in connection with that singular threat. Moreover, these communications can be with the person or indirectly through others who have a continuing relationship with that person. Defendant acknowledges that Beicker-Gallegos received at least one of his threats. Defendant addressed his additional written threats to Beicker-Gallegos, and people with whom Beicker-Gallegos had a continuing work

15

relationship intercepted the threats. Even still, viewing the evidence in the light most favorable to the verdict, the evidence shows that prison personnel drew Beicker-Gallegos's attention to at least one other threat they intercepted. Defendant also made oral threatening communications at disciplinary hearings where Beicker-Gallegos presided. These comments inspired her to file charges for threatening bodily injury.[11] All this serves as ample evidence Defendant made *a* credible threat and repeated communications in connection with that threat.

Defendant also argues the government had to prove that Beicker-Gallegos felt subjectively threatened. But this argument misses the mark. The Colorado statute does not require subjective fear. See People In Interest of R.D., 464 P.3d at 733 ("[A] listener's subjective reaction, without more, should not be dispositive of whether a statement is a true threat . . . [because] whether a particular reader or listener will react with fear to particular words is far too unpredictable a metric for First Amendment protection."). Instead, it defines a credible threat as one which would cause "a *reasonable person* to be in fear for the person's safety or the safety of his or her immediate family or of someone with whom the person has or has had a continuing relationship." C.R.S.A. § 18-3-602(2)(b) (emphasis added). An indirect threat that would cause fear in a reasonable person and that a defendant intended to instill fear in a

---

[11] As an example, at one disciplinary hearing he said the prison's disciplinary actions would not "stop his rifles and bullets" and only further motivated him towards violence upon his release. These disciplinary hearings took place before the threat Beicker-Gallegos recalls receiving. But the Colorado statute defined "in connection with" as conduct occurring "before, during, or after the credible threat." C.R.S.A. § 18-3-602(2)(a).

16

specific victim is enough.  <u>See</u> C.R.S.A. § 18-3-602(b).  Defendant addressed multiple threats to Beicker-Gallegos.  This evidence shows he intended that *she* feel threatened. The government also offered evidence of Defendant's threats to rape and kill white women, his reference to Beicker-Gallegos as a "white DHO b\*\*ch," and his notation that he needed to google her home address.  Viewing the evidence in the light most favorable to the verdict, these explicit and vulgar threats addressed to Beicker-Gallegos would cause fear in a *reasonable person*.  For these reasons, the government offered sufficient evidence for the jury to convict.

AFFIRMED.

Entered for the Court


Joel M. Carson III
Circuit Judge

17